## CHARLES EARLL

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 14, 1881.*

99   123
24a   33

99   123
150   625

99   123
66a   390

99   123
110a 1282

1. PRACTICE—*State's attorney making remarks, etc., to prejudice jury.* Where one is put upon trial for a grave crime involving his liberty or life, it is highly improper for the prosecutor to do or say anything the only effect of which is to inflame the passions or arouse the prejudices of the jury against the accused, without throwing any light on the case.

2. SAME—*duty of court to suppress improper remarks.* It is the duty of the court, on its own motion, promptly to suppress any attempt on the part of counsel for the People to bring irrelevant matters into a case, merely for the purpose of exciting the prejudices of a jury.

3. SAME—*objection should be made, and exception taken.* On the trial of one for murder in attempting to produce a miscarriage, the State's attorney read to the jury, from the Reports, a similar prosecution against the accused, and commented upon the facts of that case, and denounced the accused as a "red-handed abortionist," without objection on the part of the defence: *Held,* that while this was a grave breach of professional duty, and highly unjust to the accused, it could not avail on error, for the reason no objection was made and exception taken on the trial.

4. The law will not permit counsel to sit silently by and witness irregularities, without any effort to prevent the same in the court where they occur, and then take advantage of them in a court of review.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. E. & A. VAN BUREN, for the plaintiff in error:

After an argument of some length to show that the verdict was against the evidence, counsel made the points that the court erred in allowing the State's attorney to read in evidence the case of *Earll* v. *The People*, 73 Ill. 329, and in allowing the State's attorney, in his closing address, to allude to the *Rosette Jackson case*, and to repeatedly denounce the defendant as the "red-handed murderer" of Rosette Jackson. Wharton's Crim. Ev. (8th ed.) secs. 29, 30; *Yoe* v. *The People*, 49 Ill. 412; *Wilson* v. *The People*, 94 id. 299; *Fox* v. *The People*, 95 id. 71; *Hatch* v. *State*, 8 Tex. 417; *Ferguson* v. *State*, 49 Ind. 33; *Fletcher* v. *State*, id. 124.

Mr. JAMES McCARTNEY, Attorney General, for the People:

The State's attorney did not read the case of *Earll* v. *The People* in evidence, but read it only as a part of his argument to the jury. It seems to be an unsettled question how far a court may go in restraining a lawyer in the manner of his trial of a case. The jury being judges of the law, counsel have the right to read law to them on the argument.

Mr. LUTHER LAFLIN MILLS, State's Attorney of Cook county, also for the People.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

Plaintiff in error was tried in the Criminal Court of Cook · county, at the November term, 1880, upon an indictment charging him with the murder of Etta Carl, in attempting to produce an abortion. The jury acquitted him of the charge of murder, but convicted him of an assault with intent to produce an abortion, and fixed the time of his confinement in the penitentiary at five years, and he was duly sentenced by the court, in pursuance of the verdict. Plaintiff in error asks a reversal of this sentence on several grounds, but mainly

because it is not supported by the evidence. There is but little room for controversy as to what the actual facts are which are relied upon to sustain this conviction. The real difficulty consists in determining what conclusions may safely and fairly be drawn from them. The facts themselves are, briefly, as follows:

About two o'clock of the morning of the 25th of August, 1880, the dead body of Etta Carl was discovered by John G. Davis, a policeman, in the main hall on the second floor of the building known as the Davy block, on the north-west corner of Green and Madison streets, Chicago, where it had, a short time before, been placed by the accused. The accused was a practicing physician, and occupied room No. 10, on the same floor of the building in which the deceased was found. His room was divided into several apartments, in which he lodged, and also received and treated his patients, and was situated at the further end of a hall running due north from the head of the stairway, and crossing the hall at right angles, in which the deceased was laid, some thirty feet east of where the body was discovered.

Davis testifies, that on that morning, about the hour just mentioned, he and officer Derrick, another policeman, were standing on the sidewalk near the entrance of this building, and while there his attention was arrested by a stir on the second floor, that "seemed (as he expresses it) to be a sort of scuffling of feet," whereupon he ascended the stairway, and on reaching the second floor discovered the accused at the end of the hall, in front of the door of his room, with a wet cloth in his hand, rubbing the floor; that upon observing witness the accused at once withdrew to his room, closing the door after him; that on discovering the body of the deceased he called to his companion, Derrick, and the two went immediately to the room of the accused, and knocked a number of times before obtaining any response; that after considerable knocking on the door and threatening to break it in, the accused asked witness, from within, if he was officer Davis,

who lived in the building, and on being informed that he was, he replied he would open the door as soon as he was dressed. The door was soon opened and the rooms thoroughly searched, but nothing was discovered of any significance except a vaginal syringe, an intro-uterine syringe, and a lady's gold watch, which is admitted by the accused to have belonged to the deceased. Quite a variety of instruments were found, but they were all such as are necessary and usually kept by city physicians in regular practice. No person was found in the room other than the accused and his little son, Fred, who gave vent to his feelings in tears. The search of the room being concluded, the accused was taken by the witness in presence of the corpse, and upon perceiving it he ejaculated, "what is this," or, "my God, what is this," or something to that effect, in answer to which the witness remarked, "I guess you know what it is." To which the accused replied that he had seen her before.

The deceased, when discovered, was lying across the hall, her feet pointing north, about two feet west of a gas-burner, a hat lying near her head, her left arm by her side, and her right hand across her breast, inside of which was a small bottle containing chloroform.

The officer also testifies to a conversation which he had with the accused on the following morning, which is substantially as follows: "At the station I took the doctor (accused) up to the captain's office, and questioned him in regard to this girl, Etta Carl. He said, some four or five weeks previous she came there to have an abortion performed on her; said that he had used his finger in some way; don't remember exactly, but he motioned with his two fingers, making her believe that he was performing an abortion; I think that she had visited him four or five times, and that on the afternoon of the 24th of August she called there about four o'clock, and after she came he said he was doing something with her; I think he said he was injecting water, using a syringe. I spoke to him about this bottle of chloroform, and if I

remember right I think he said that he didn't see it until
after he carried her into the hall. I asked why he carried
the body into the hall. He said he didn't know hardly
what to do, he was under such a state of excitement. First
he had a notion to notify the police, then that he would carry
the body into the hall. He said he believed it was more an
insanity freak than anything else, of carrying the body into
the hall."

The testimony of Davis, as to what occurred at the office
of the accused on the morning of the discovery of the body,
is corroborated by officer Derrick. Outside of the medical
testimony, which is based upon a *post mortem* examination,
and the admissions of the accused, the foregoing are about all
the important facts bearing on the case.

A *post mortem* examination, conducted by Dr. Bluthardt,
county physician, in the presence of a number of physicians,
some of whom were witnesses for the accused, was held on
the same day, at the office of the accused, over the body of
the deceased. Dr. Bluthardt testifies that the deceased was
about 19 years of age, a little fleshy, and would weigh about
140 or 145 pounds; that when he first saw her she was lying
on a table in Dr. Earll's office, with a two-ounce bottle in her
hand, which contained about four drachms of chloroform,
the bottle being corked; that he did not discover anything
further than incipient inflammation of the organs, the abdo-
men,—that is, the covering of the bowels; that the perito-
neum was somewhat adhering to the fundus or upper part of
the uterus; * *. * that he opened the uterus at the upper
and interior surface, from the mouth to the fundus, and in-
side he found a fœtus about five months old; that the fœtus,
with the membranes surrounding it, and the placenta
adhering to the inner walls of the uterus, were perfect and
intact; * * * that he found the neck and mouth of the
uterus sufficiently dilated to admit his forefinger, and some-
what inflamed on its inner surface, and suppurating; that he
found the heart natural, only it was filled with clotted blood,

and gives it as his opinion that the deceased died from injection of water into the pregnant uterus.

On cross-examination, he states that he does not believe the sack which surrounds the fœtus could be ruptured by the use of a vaginal syringe, and that it is not regarded as dangerous to inject water into the vagina with such a syringe. He also admits that inflammation of the character discovered by him may be produced by certain kinds of work or exercise, such as the frequent use of a sewing machine, and that it often happens without any direct forcible injury to the affected parts, as in the case of inflammation caused by venereal disease; that such a shock as he supposes caused her death might have been produced by causes other than that of injecting water into the uterus, such as sudden fright, excessive joy or grief; that he did not know that deceased had any of the symptoms of such a shock.

It further appears, that this witness delivered to the coroner's jury a sworn statement, in which he gave the results of the *post mortem,* which differs materially in several important particulars from his present testimony. In that statement he attributes the death of the deceased to a different cause from that stated in his present testimony, but claims that the former statement, owing to the hurry in which it was prepared, did not truly express his opinion as to the cause of her death.

The accused also made a sworn statement before the coroner's jury, which was admitted in evidence on the trial, the substance of which is as follows: "I saw the dead body this morning in the hall of the building where I reside, and I placed the body there. I have seen the person alive whose dead body was found there. I saw the person four or five times since my first acquaintance, which began four or five weeks ago. She thought herself at that time pregnant, and I examined her and told her I thought she was. I did not do anything to her at that time, although she urged me to produce an abortion upon her. I declined to do so. Several

days after she came to me again and repeated her request. I then made a demonstration, not using instruments, but simply using my fingers, without interfering with the womb any way, to give her the impression that I had performed an operation upon her. She then went away, and several days after she came back again, and said no effect had been produced from the operation, and I repeated the same demonstrations in four or five instances, at intervals of four, or five, or eight, or ten days. Never, at any time, have I used any instruments upon her whatever. My impression is that I did insert one sponge tent back of the neck of the womb, and against the back part of the vagina; that was at the next to the last visit she paid me, some four or five days previous to yesterday. She had no hemorrhage, so far as I know. There was a little leucorrhœa. I did not think she had any fever. * * * She called on me between three and four o'clock yesterday afternoon, and asked me to inject the womb. I put about four ounces of water in the wash-bowl, and with a No. 3 plain black rubber syringe injected the water into the vagina. She immediately after complained of pain in her heart, and of feeling faint. She was standing, and I laid her on the bed and administered some carbonate of ammonia and whisky—about ten grains carbonate of ammonia. She swallowed at first, but towards the last it ran out of her mouth. Death followed in about five minutes after I ceased giving her medicine. I should judge it was a little after 4 o'clock when she died. It was about half an hour after I used the injection when she died. She complained of no pain in her abdomen, and did not even put her hand on her abdomen. I did not know what to do after she died. It threw me into a state of excitement, so that I scarcely knew what to do. I first thought to report the case to the station, but it went on until late at night, when, under a high state of excitement, I took the body up and carried it into the hall, laying it down in about the center of the large main hall, almost directly under the gas light. There was a draft through the hall.

After depositing the body as described, I returned to my office and noticed that the little lamp, that is usually turned down low of nights, was blown out. That lamp is stationary, and is in the hall outside my door. I struck a match and lit that lamp, and then stepped inside my door, closed and locked it, undressed myself and went to bed. I had been there but a short time when the police officers came to the door, and I opened it as soon as possible and came to the station with the officers. My son left the reception room to retire to bed about half-past nine last night, and I did not see him after that till after the officers came. He did not see the body of deceased till we went into the hall with the officers. I first met deceased at my office. She came there alone, five or six weeks ago. A lady called with her at one time after that. Perhaps she called twice. * * * I did not notice any bottle in the hands of deceased until I deposited the body in the hall, when I saw a bottle in the right hand. I did not place the bottle there. I inserted the sponge tent, as I have described, simply to gratify the deceased. Deceased never told me that any one else had performed any operation upon her."

Dr. Hutchinson gave it as his opinion, based upon the facts as stated by Dr. Bluthardt, that the deceased died from a shock produced by intro-uterine injection.

Professor Byford, who has made the diseases of women and obstetrics a specialty, states that in the absence of an anatomical alteration, that is usually found in cases of that kind, he was unable to see any cause of death other than nervous shock or syncope fainting, and that in reaching this conclusion he took it for granted that water had been injected into the uterus.

Several physicians, of evident learning and skill in their profession, were examined on behalf of the accused, whose testimony is mainly directed against the hypothesis that the deceased's death was caused by the injection of water into the uterus, by means of a No. 3 vaginal syringe.

Upon this question we are clearly of opinion that the decided weight of testimony is with the accused.

On the other hand, we are of opinion that the medical testimony satisfactorily establishes the fact that syncope, followed by death, may be caused by a sudden shock of the nervous system, produced in various ways, and among others by injecting water into the uterus, and in the absence of all evidence tending to show she died from any other cause, we think we are fully warranted in coming to the conclusion that the deceased must have come to her death from such a shock, produced by the injection of water into the uterus. It is evident that the incipient inflammation of the peritoneum, and of the more advanced inflammation of the inner surface of the *cervix uteri,* could not have produced such a result. The *post mortem* examination developed no organic derangement. All the vital organs were in a normal and substantially healthy condition. The derangement, therefore, which resulted in her death, was functional only, and the clotted blood found in the heart, taken in connection with the account which the accused himself gives of the affair, conclusively shows that the action of the heart must have become paralyzed by some sudden and powerful shock to the nerve centers, which resulted in almost immediate death.

And since the evidence wholly fails to point to any agency that would have been likely to have produced such a shock, other than the injection of water into the uterus by the accused, the vital question, therefore, presented by the record in this case is, does the evidence satisfactorily establish this hypothesis? Let us examine it for a moment. It is admitted that several weeks before her death the deceased came to the office of the accused and informed him that she was pregnant, and that she wanted him to produce an abortion; that he accepted of her a watch on account of his retainer; that he introduced his hands into the vagina and made certain demonstrations; that this was repeated from time to time, for several weeks; that he inserted a sponge tent between the

back of the vagina and the neck of the uterus; and that just a few minutes before her death he injected water into the vagina. All this, however, he claims was a mere pious fraud, practiced upon the deceased for the purpose of making her believe he was trying to produce an abortion, when nothing of the kind was intended. This explanation of his conduct is not satisfactory. If, as he claims, he had no purpose of doing what he had led her to believe he was trying to do, it was palpable dishonesty in him to accept her watch under such circumstances. One who would take the property of another under such false pretences, would not be likely, from mere moral or religious convictions, to hesitate to commit an abortion, or to manufacture a falsehood to cover up his complicity with it, after having committed one. But it is said, in answer to this, there was no intention of keeping the watch; that his services were gratuitously bestowed, and were intended as a mere charity to a poor and penniless girl. We fail to see any charity in the rendition of services of that character. Honesty and duty alike demanded of him, when first approached by her upon the subject, to tell her plainly that what she asked of him was a grave crime, involving the destruction of an unborn child, endangering her own life, and obnoxious to the laws of both God and man, and which he could not, under any circumstances, consent to perform. Instead of this, as he admits himself, he first relieves her of her watch, then commences tampering with her for the purpose of deceiving her, as he claims; keeps it up for weeks, when suddenly, while in the very act of being treated, she dies on his hands in the manner we have seen. The reasons which are assigned by the accused for his conduct are so highly improbable, that no one, unless possessed of an unusual amount of credulity, would be likely to accept them as true, and we are not, therefore, surprised that the jury were unable to so accept them.

Rejecting, then, as unworthy of belief, so much of the statement of the accused as seems to have been made with a view

of exculpating himself from criminal responsibility, is it not more reasonable to conclude, in the light of all the admitted circumstances, that the injection was given with the intro-uterine syringe instead of the vaginal syringe, and that the water, instead of being injected into the vagina, merely, was injected into the uterus? Several considerations support this view, while there is nothing opposed to it except the simple denial of the accused:

*First*—By the concurrent testimony of all the medical witnesses, water could not have been thrown into the uterus by the vaginal syringe.

*Second*—The injection of water into the vagina alone would not have produced such a shock to the nervous system as to have caused death.

*Third*—The fact that the shock was produced while in the act of giving the injection, strongly tends to show, in the absence of all evidence to the contrary, that the injection caused it, and this it could not have done, as we have already seen, if it had been given with the vaginal syringe.

*Fourth*—While it may not be of any great significance, yet we deem it worthy of note that when the search instituted in the office of the accused was made, the uterine syringe was found lying on the table as though it might have just been used, while the vaginal syringe was found put away in a covered box. It is but reasonable to suppose, in the excitement of the moment the instrument used was left on the table, where it was probably laid at the time of using it.

Nor can we accept as true the statement of the accused to the effect that the sponge tent used by him was simply placed between the back of the vagina and the neck of the uterus. It appears from the medical testimony, that one of the ordinary uses to which such an instrument is applied is that of dilating the mouth of the uterus, and the *post mortem* examination shows that the uterus, at the time of her death, was so dilated as to easily admit the forefinger of the dissecting surgeon, and the inner surface of the canal of the *cervix uteri*

was inflamed and suppurating,—the very condition the use of such an instrument for four or five days would probably bring about. All this, taken in connection with the admission of the accused that he used the tent next to the last visit she made to his office, some five or six days before her death, tends strongly to show that it was used for the purpose of dilating the mouth of the uterus, and producing the inflammation which followed, both of which were but parts of the systematic assault by means of which a breach was finally to be made in the amnion wall, and abortion effected.

Again, we can not repress the conviction that the bottle of chloroform found in the hand of the deceased was placed there by the accused. It is highly improbable that, dying from the cause she did, it would have been left after death, clutched in her hand so tightly as not to have fallen in removing her into the hall. Nor is it reasonable to suppose her right hand fell across her breast in the position it was found, by mere casualty, and the same hand that placed it in that position most likely placed the bottle of chloroform in it. The fact that the bottle was found corked, would seem to negative the idea that chloroform had any agency in her death. The whole thing appears like a mere artifice to divert attention from the real cause of her death.

But the most damaging testimony against the accused is his conduct after the sad and fatal affair. The deceased died about four o'clock of the afternoon of the 24th, and no alarm or notice of the fact was given by him to the public at all. The corpse was kept concealed in his office till a late hour in the night, when all the inmates of the house were supposed to be asleep, and then carried out and laid in the hall in the manner we have seen.

When we take into consideration the age, presumed intelligence and experience of the accused, and the character of his profession and calling, we are justified in expecting that he would, under such circumstances, if innocent, display the

highest degree of coolness, courage and prudence. As an innocent man we should have expected to have seen him give immediate notice of her death to the public, with a frank statement of the circumstances under which it occurred. Instead of this, with the corpse concealed in his office, he withholds all notice of the affair, until late in the night, when he quietly and stealthily removes it into the hall of the building. After thus disposing of the body, he, at two in the morning, is discovered by a policeman in front of his door with a wet rag in his hand, cleaning the floor. Why engaged in cleaning the floor at this unseasonable hour? No explanation is vouchsafed by the accused for this remarkable conduct, further than the simple statement that "he did not know what to do after she died, he was so excited." This explanation is not satisfactory. Assuming the accused to be guilty, we can readily account for the excitement of which he speaks, but not otherwise. To the aged physician, who has become accustomed to death-bed scenes, the loss of a patient under proper and legitimate treatment is not likely to deprive him of all presence of mind and sense of duty, as is claimed to have been done in this case. In short, the conduct of the accused in this matter seems to us to be incompatible with his innocence, and, upon the whole, we are of opinion the jury were warranted in finding him guilty.

It is further objected, that counsel for the People improperly, and with a view of creating a prejudice against the accused, read to the jury on the trial the statement of the case of *Earll* v. *The People*, 73 Ill. 329, from which it appears the accused had been previously convicted of an offence similar to that for which he was then being tried, and that during the course of his argument the counsel commented on the facts of that case, and characterized the accused as a "red-handed abortionist," and charged him with the taking of the life of Rosetta Jackson, the victim in that case. The

conduct of the prosecuting attorney was clearly improper and indefensible.

When one is put upon his trial for a grave crime, involving his liberty and life, as in this case, it is highly improper for the prosecutor to do or say anything whose only effect will be to inflame the passions or arouse the prejudices of the jury against the accused, without throwing any light upon the case in hand. And this is particularly so where the thing thus improperly dragged into the case is purely a collateral matter, that has not the slightest connection, as was the case here, with the charge for which the accused is being tried. And in this case it would clearly have been the duty of the court to have stopped counsel in his remarks, if its attention had been called to the matter. It is the duty of the court, on its own motion, to promptly suppress any attempt on the part of counsel to drag irrelevant matters into a case, merely for the purpose of exciting the prejudices of the jury. We must assume, however, in this case, that the conduct of the People's attorney escaped the attention of the court, and, inasmuch as no objection seems to have been made by counsel for the accused, the irregularity must be deemed to have been waived. The law will not permit counsel to silently sit by and witness such an irregularity, without any effort to prevent it in the court where it occurs, and then allow him to take advantage of it in a court of review. We do not regard even the reading of the former case as fair to the accused, although the right, as a general rule, to read from the Reports is conceded, yet the necessary tendency of reading the statement of the facts and the conclusion of the court in the former case was to place the accused at a disadvantage before the jury. It would have been entirely proper for counsel to have read any proposition of law laid down in that case, but that could well have been done without making any reference to the facts or the names of the parties; or, the principles announced in it, if deemed important, might have been given to the jury in instructions. But the most objec-

tionable feature of counsel's conduct in the case was his discussion of the facts in the former case, and the terms by which he characterized the accused in connection with them. This was a grave breach of professional duty, and highly unjust to the accused.

The channels of justice must be kept pure, and every officer of the law whose duty it is to assist in its administration should aid in doing so. But, for the reason already stated, the irregularity complained of can not be availed of here.

Perceiving no substantial error in the record, the judgment will be affirmed.

*Judgment affirmed.*