(No. 53260.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. FREDDIE TILLER, JR., Appellant.

*Opinion filed December 17, 1982.—Rehearing denied
January 28, 1983.*

306

MORAN, J., and RYAN, C.J., dissenting.

John H. Reid and Randy E. Blue, Deputy Defenders, and Richard J. Bennett, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Herbert Lee Caplan, Melbourne A. Noel, Jr., and David Cassorla, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Freddie C. Tiller, Jr., with a codefendant, Andre Jones, was indicted in the circuit court of St. Clair County for three counts of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), three counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A-2), and three counts of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)). Jones subsequently pleaded guilty to three

counts of murder and was sentenced to death. On appeal Jones' convictions and two of the death sentences were affirmed. *People v. Jones* (1982), 94 Ill. 2d 275.

The victims of the murders were Samuel Nersesian, Debra Brown, and Richard Stoltz. Prior to trial defendant filed a motion "to amend the indictment" and requested that the three counts concerning Stoltz be severed on the ground that they related to an occurrence separate from the offenses involving Nersesian and Miss Brown. The motion was allowed, and the People elected to proceed against defendant on the six counts involving Miss Brown and Nersesian. Defendant was convicted of two counts of murder, two counts of armed robbery, and two counts of armed violence. A second jury was impaneled and found that one or more of the factors set forth in the statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) existed and, following the consideration of aggravating and mitigating factors, found that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentences were stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603).

At trial, Laurie Elem testified that she and her three children had lived with Andre Jones for approximately two months prior to the date of the occurrences in question. On the morning of April 30, 1979, she and Jones left their apartment and walked to the home of her cousin, Lucy Williams. Jones was carrying a .22-caliber revolver. At the Williams residence they met defendant, who had spent the night there. Defendant is also a cousin of the witness. After a brief visit, Jones, Elem, and defendant left the Williams apartment together. As they walked they drank beer and a bottle of "brass monkey," described as being a kind of wine. There was some discussion of robbing the Illinois Cleaners, a cleaning

shop located across the street from the apartment occupied by Jones and Elem. Meanwhile, as they approached another cleaning shop, defendant asked Elem to go into the cleaners and request permission to enter the back room to find her clothes. While there, Elem was to unlock the back door so that defendant and Jones could enter to rob the proprietor of the store. Elem refused this request and the three continued walking. They walked for some distance along a railroad track and came to a brickyard where they saw a man, Richard Stoltz, loading bricks onto a trailer. Defendant asked Jones for the revolver Jones was carrying, stating his intention to rob the man. Jones gave him the weapon. The two men approached Stoltz, and Elem walked away toward the street. Elem turned and saw defendant pointing the gun at Stoltz. She saw Stoltz remove something from his arm while shaking his head sideways. Elem turned her head from the scene and then heard a shot. She started running, and defendant caught up with her, carrying the gun in his hand. Jones soon rejoined them, carrying a watch and a set of keys. Jones told defendant, "Man, you shot the shit out of that honky," to which defendant replied, "I mean business. He wouldn't up the cash." Jones then retrieved the gun from defendant, replaced the used cartridge, and put the gun in his pocket. The three proceeded towards the Jones and Elem apartment. The two men discussed robbing the Illinois Cleaners and defendant again tried to get Elem to help, suggesting a scheme similar to the one proposed for robbing the cleaners they had passed earlier. Elem again refused. Defendant and Jones discussed who would hold the gun and defendant stated that he wanted to. When they reached Illinois Cleaners Jones removed a ski mask from his back pocket. Elem left Jones and defendant near the cleaners, crossed the street, and went home. Approximately 15 to 20 minutes after she left Jones and defend-

ant, Jones came to her apartment, but soon left again. Defendant then came in, but he too left after a short time. The two men made a number of trips in and out of the apartment, and during one of these trips defendant brought in a television set and Jones brought in some money and some clothing. Elem did not see defendant again until later that evening when he returned to the apartment. During this visit defendant asked Jones, "Did you put the mail lady up?" When defendant finally left the apartment that evening he had with him the watch taken from Stoltz and a share of the money obtained from the robbery of the cleaners.

Defendant testified that on April 30, 1979, between 8 a.m. and 8:30 a.m., Jones, Elem, and defendant set out together, walking toward the Jones and Elem apartment. They walked and drank some beer and a wine-like alcoholic beverage. Sometime that morning defendant ingested five pink pills that he had bought from someone on the street. Defendant did not know the contents of these pills. Defendant stated that as a result of the alcoholic beverages and the pills he was unable to remember clearly what happened that day. Defendant testified that he and Jones and Elem walked until they came to the brickyard where Stoltz was loading bricks. Defendant said to Jones, "Let's go make some money," intending that he and Jones help the man load the bricks for pay. As they approached Stoltz, Jones drew a gun and pointed it at Stoltz. This was the first time defendant had seen the gun. Jones ordered Stoltz to give him something and Stoltz denied having it. Defendant began running away from the scene and heard a gunshot. He denied seeing the actual shooting or ever possessing the weapon. The three reunited and continued walking until they reached the alley beside the Illinois Cleaners. Defendant and Jones stopped, but Elem walked on past the cleaners. Jones said he had some clothes in the

cleaners so the two men entered the shop. Jones placed a cleaning ticket on the counter, and when the proprietor picked it up, Jones drew the gun and announced a "stick-up." Jones and defendant went behind the counter, and while Jones was pointing the gun at the proprietor, defendant took a television set from the back of the shop. Defendant carried the television set to the front of the shop and set it down. He observed that Jones was holding the gun against the proprietor and was searching the drawers behind the counter. Defendant began to leave the cleaners without the television set when he observed a postal mail carrier approaching the shop. Before leaving, defendant twice told Jones not to hurt the "mail lady." Defendant left the cleaners and passed by a "gas company car" parked at the corner. Defendant waved a "peace sign like" to the occupants of the car. Defendant caught up with Elem, and the two of them went to her apartment. After a few minutes defendant left the apartment and returned to the cleaners. Not seeing anyone inside, defendant opened the front door, reached inside, and picked up the television set from its position near the door. Defendant had not returned for this purpose. Defendant placed the television set in a "mail Jeep" parked nearby and drove to Elem's apartment, where he left the television set. Defendant drove the mail Jeep to an abandoned house and searched through the undelivered mail. He drove the mail Jeep to his aunt's home and while there he talked with Annette Simpson. He showed her a number of income tax refund checks which he had found among the undelivered mail and gave her two of them. He drove the mail Jeep around a while longer and eventually abandoned it. Later that day defendant saw Simpson and asked if she had cashed any of the checks he had given her. Sometime between 5 p.m. and 6 p.m. defendant returned to the Jones and Elem apartment. Both Jones

and Elem were at the apartment. Defendant asked Jones what had happened at the cleaners but could not remember Jones answering. Defendant received some curtains which had been taken from the cleaners and then left the apartment. Defendant denied asking the question, "Did you put the mail lady up?" and denied receiving any money from the robbery of the cleaners.

Calvin Randolph, an Illinois Power Company employee, testified that he was driving past Illinois Cleaners at approximately 10:30 a.m. on April 30, 1979, when he noticed two men, one of whom was wearing a ski mask, standing in the alley adjacent to the cleaners. Randolph momentarily stopped his car and then moved it to a position from which he could observe the entrance to the cleaners. Randolph observed defendant walking away from the cleaners. As defendant passed Randolph's car he looked in and waved a "peace sign" to Randolph. Defendant continued down the street until he was out of sight. Soon thereafter Randolph left the scene. Randolph testified that he had seen no mail truck and heard no shot.

Annette Simpson testified that sometime between 9 a.m. and 10 a.m., April 30, defendant contacted her at the house of a relative. Defendant gave her two checks and told her he had a mail truck outside. Simpson asked no questions at that time. Later that day she cashed one of the checks. At about 3 p.m. she saw defendant and he mentioned the robbery and the killing at the cleaners. Simpson testified that defendant told her he had killed the "mail lady and the cleaners man" and stated that she did not believe him at that time. Later that day she heard about the robbery and killings from someone else. She subsequently burned the other check which defendant had given her.

The medical testimony showed that Stoltz had received a gunshot wound to the left eye and that the

cause of death was brain damage. Nersesian had received two gunshot wounds to the skull, both of which were contact wounds. The cause of Nersesian's death was brain damage resulting from the two head wounds. Miss Brown had received two gunshot wounds, one slightly right of the center of the chest and another in the mouth. The cause of death was damage to the heart. Gun powder marks indicating a shot from close range were found around her mouth. A ballistics expert testified that the bullet fragments removed from the three bodies could have been fired from the weapon identified as the .22-caliber revolver carried by Jones on April 30, 1979.

At the close of the evidence, the jury was instructed, *inter alia,* on the felony-murder doctrine and the theory of accountability. The jury returned general verdicts finding defendant guilty on all of the six counts charged.

The People gave notice that they intended to seek the death penalty on the ground that defendant had been convicted of murdering two persons. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).) A new jury was impaneled for the sentencing hearing. The record fails to reflect the reason a separate jury was chosen; the court had earlier denied defendant's motion for a separate jury. During *voir dire* the court informed the new jury that the issue of whether defendant murdered two people had already been decided. The evidence introduced at the first phase of the sentencing hearing consisted of a certified copy of the murder convictions and the testimony of the pathologists who performed the autopsies on Nersesian and Miss Brown. At the conclusion of this first phase of the sentencing hearing the jury determined that defendant had attained the age of 18 or more at the time he committed the offense of murder and that he had been convicted of murdering two or more individuals. After receiving information in aggravation and mit-

igation the jury decided that there were no mitigating factors sufficient to preclude a sentence of death. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g).) The court sentenced defendant to death for the murders of Samuel Nersesian and Debra Brown.

We consider first defendant's contention that he cannot be held liable for Jones' actions against Miss Brown because he was not present when she was shot and because there was no showing that he encouraged or aided Jones in the commission of the offenses against her. In support of this contention, defendant asserts that the undisputed testimony shows that he disassociated himself from any "common criminal purpose" towards her by leaving the cleaners and admonishing Jones not to hurt her. We do not agree. There is ample evidence to support defendant's conviction of the robbery and murder of Nersesian. The jury had before it evidence to support the conclusion that defendant and Jones planned the robbery and that Miss Brown was murdered to prevent her from identifying Jones and defendant as the robbers of Nersesian. As such, her murder was in furtherance of the robbery, and defendant is accountable for his accomplice's act. Even if the jury believed that, as he left the cleaners, defendant warned Jones not to hurt Miss Brown, he could nevertheless be accountable for her murder. Any act committed by his accomplice Jones in furtherance of the robbery of Nersesian is attributable to defendant. *People v. Brendeland* (1957), 10 Ill. 2d 469, 472.

Defendant contends that his alleged admonishment to Jones not to hurt Miss Brown is a "critical factor indicating that [he] did not share any common criminal purpose as to her ***." Defendant's argument is essentially that he withdrew from the robbery when he left the cleaners due to his admonition to Jones regarding Miss Brown. This argument, which apparently is premised on

subsection (c)(3) of section 5—2 of the Criminal Code of 1961, must fail. The statute provides:

"[A person is not accountable under this section if]

(3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense." (Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c)(3).)

Defendant's actions upon leaving the cleaners hardly vitiates his participation in the commission of the robbery, and certainly does not absolve him from liability for the murder of Miss Brown. Considering his apparent knowledge of the fact that Jones might harm her, it is essential that the record show some affirmative act which would have deprived his prior efforts of their effectiveness. A similar set of facts was presented in *People v. Tyler* (1979), 78 Ill. 2d 193. In that case the defendant and his two confederates set out to burglarize a house. Upon encountering the woman who lived there, one of the defendant's confederates took the woman to a back bedroom and raped her. Although the defendant did nothing to facilitate the offense, he was held accountable for the rape for the reason that he was aware of the crime his confederate was committing and "did nothing to disassociate himself from the occurrence ***." (78 Ill. 2d 193, 197; see also *People v. Hubbard* (1973), 55 Ill. 2d 142; *People v. Brown* (1962), 26 Ill. 2d 308.) Here, as in *Tyler,* defendant was aware of another crime that was going to occur due to the commencement of the robbery, but did nothing to prevent the crime. A mere statement of disapproval of his accomplice's intended acts is insufficient to exonerate defendant from liability for the crimes against Miss Brown.

Defendant next argues that the conviction for the armed robbery of Miss Brown must be reversed because

no armed robbery was proved. Defendant asserts that he cannot be held accountable for the armed robbery of Miss Brown because any force directed at her was not for the purpose of obtaining property through force or intimidation. To sustain a charge of armed robbery it is essential that the robber use violence or fear of violence as the means to take property in the control of the victim. *People v. Smith* (1980), 78 Ill. 2d 298, 302-03; *People v. Braverman* (1930), 340 Ill. 525, 531.

The evidence does not show beyond a reasonable doubt that the violence exerted in this case was used as a means to take the mail Jeep. A more severe penalty is imposed for robbery than for theft because a great danger exists that the robber's threat of force or violence will lead to death or great bodily harm. Taking advantage of an existing threat, where that threat was not delivered to persuade the victim to release control of property, creates no additional danger of great bodily harm. (See *People v. Pack* (1976), 34 Ill. App. 3d 894; *Woods v. Linahan* (5th Cir. 1981), 648 F.2d 973, 978.) It is not clear from the record what transpired in the cleaners, but there is no evidence to show that the force exerted against Miss Brown was for the purpose of depriving her of the mail truck or the mail in it. We conclude that the conviction for the armed robbery of Miss Brown must be reversed.

Defendant contends that he was denied a fair trial due to the admission of evidence of other crimes. The People argue that the evidence of the Stoltz murder was admissible for the purpose of showing motive, *modus operandi,* intent, and identity. Defendant argues that, even if it was admissible on those grounds, the prejudicial effect outweighed the probative value, and moreover the People did not limit the evidence admitted to that absolutely necessary to support its case on those issues.

Where evidence of other crimes is used solely to suggest that because a defendant has committed other crimes

he is more likely to have committed the crime with which he is charged, it is inadmissible. (*People v. Lehman* (1955), 5 Ill. 2d 337, 342.) Evidence of other crimes is admissible, however, for purposes other than to show propensity to commit crime. (5 Ill. 2d 337, 343; *People v. Dewey* (1969), 42 Ill. 2d 148, 157; *People v. Cole* (1963), 29 Ill. 2d 501, 503.) Here, the evidence of the earlier robbery tended to show that defendant was probably aware that the cleaners would be robbed and supported the inference that defendant and Jones robbed the cleaners pursuant to an agreed plan. Evidence of other crimes is admissible to show criminal intent (*People v. McDonald* (1975), 62 Ill. 2d 448, 455), and the evidence of the robbery and murder of Stoltz was admissible for this purpose.

Defendant argues that even if the evidence of Stoltz' murder was admissible for a proper purpose, the prejudicial effect clearly outweighed the probative value, and thus the circuit court abused its discretion in admitting the evidence. Defendant argues that the evidence was "gory" and must have had extreme prejudicial effect on the jury. The evidence was gruesome because the crime was gruesome. We cannot say that the circuit court abused its discretion in considering the probative value of the evidence on the issue of intent.

Citing *People v. Lindgren* (1980), 79 Ill. 2d 129, 139, defendant argues that the People may not introduce evidence of other crimes if it has other evidence probative of the issues for which it seeks to introduce the evidence. Defendant's reading of our decision in *Lindgren* is inaccurate. In *Lindgren,* in order to show that the defendant was in the same area where the crime was committed at approximately the same time, the prosecution elicited testimony from a witness concerning a fire started by the defendant that same night. This court held it was error to permit the introduction of the testimony about the arson when it only served to establish time and place proximity

of the defendant, especially when the witness could have established the same facts without reference to the crime of arson. Here, however, the evidence was used to prove the intent of defendant, the critical issue in this case. The prosecution is not precluded from presenting evidence of other crimes for a proper purpose merely because it had some other evidence on that point.

Defendant next asserts that even if evidence of the armed robbery of Stoltz was admissible, the circuit court committed reversible error in failing to limit the evidence of any other crimes to that which was absolutely necessary to support its case on the issues for which the evidence was admitted. Defendant argues that the detailed testimony concerning the results of the autopsy of Stoltz and the testimony of Stoltz' wife were presented to the jury solely to arouse their passions. Defendant also asserts that the fact Stoltz died of his injuries was not at all relevant to the case. Defendant argues that *People v. Lindgren* and *People v. Nickolopoulos* (1962), 25 Ill. 2d 451, taken together, stand for the proposition that when evidence of other crimes is admitted to prove identity, intent, or *modus operandi*, the evidence should be strictly limited to what is necessary to prove that point so that prejudice can be avoided.

While we do not disagree with this proposition, we find no reversible error in the admission of this evidence. The testimony of Stoltz' wife was used to show that Stoltz was robbed as well as murdered, and thus was necessary to prove that fact. The detailed testimony concerning Stoltz' wounds and the fact that he died from those wounds was irrelevant to prove defendant's intent with regard to the robbery of Nersesian. It did not, however, introduce anything new to the jury, but merely corroborated what the jury must have already surmised about the extent of Stoltz' wound.

Defendant contends next that, without basing his opin-

ion on the evidence, the State's Attorney improperly accused him of lying and that during closing argument he improperly stated his opinion as to the guilt or innocence of the defendant. A prosecutor may state his opinion that a defendant is lying if the statement is based on the evidence. (*People v. Weaver* (1959), 18 Ill. 2d 108, 115; *People v. Sinclair* (1963), 27 Ill. 2d 505, 509; see *People v. Weathers* (1975), 62 Ill. 2d 114, 120.) Here, the State's Attorney's statement was based on the many prior inconsistent statements with which defendant was confronted on cross-examination and on other evidence which made defendant's testimony incredible. A prosecutor may not give his own opinion as to the guilt or innocence of the accused (*People v. Monroe* (1977), 66 Ill. 2d 317, 324) unless the prosecution states, or it is apparent, that the opinion is based solely on the evidence. The prosecutor stated in closing argument:

> "I know I think I know who killed Sam Nersesian, who shot them and killed them, and Debra Brown. You know who it was, Andre Jones and Freddie Tiller. That is who did it."

Taken out of context, the statement might appear to state the prosecutor's opinion as to the guilt or innocence of the defendant. But the prosecutor went on to say:

> "And Mr. Hamman is going to get up here and argue there is no proof that my client shot anybody or killed anybody. I would answer that in a little phrase, common law pleading, I demur. It means so what."

The State's Attorney went on to explain that, even without proof that defendant pulled the trigger in the two murders for which he was on trial, he was still guilty because of the law of accountability. When the State's Attorney's statement is read in its entirety, it is apparent that his opinion regarding defendant's guilt was based on the evidence presented in the case and not his own personal beliefs.

Defendant also argues that it is improper to impeach

the integrity of defense counsel, citing, *inter alia, People v. Monroe* (1977), 66 Ill. 2d 317, 324. While we agree with this statement of the law, we disagree that the State's Attorney tried to impeach the integrity of defense counsel. The prosecutor stated in closing argument:

"I would say this to Mr. Hamman [defense counsel], he should come here and explain to you at the outset of his argument his reason for not being able to say to you, my client told you under oath the truth, the whole truth, and nothing but the truth so help him God. Have him explain that, the honesty of his client."

It would appear that the prosecution was not impeaching the integrity of defense counsel with this statement, but was suggesting that if defense counsel did not take a particular course of action in his closing argument, it would bolster the prosecution's argument that the defendant was lying on the witness stand.

Defendant also complains of several characterizations made in the State's Attorney's closing argument. The prosecutor explained to the jury that there is a biological hierarchy to the life forms on Earth, ranging from man to amoeba. He stated that man has elevated himself to a plateau above the animals because man, through technology, has eliminated survival of the fittest, but animals must still kill to survive. Criminals, however, are lower than animals because they kill without reason. He explained that there is a hierarchy among criminals, and explained how each different crime committed by the defendant elevated him to a higher level of repugnancy on the criminal hierarchy. The State's Attorney also characterized the three murders as a holocaust, similar to the Nazi holocaust depicted in a television show broadcast the night before closing arguments were made. These statements constitute error. In *People v. Elder* (1962), 25 Ill. 2d 612, 614-15, this court held that characterizing the defendant as an "animal" did not constitute reversible error when the statement was supported by the complaining witness' description of the rape and ac-

companying deviate sexual acts and no objection was interposed at trial. The court noted its disapproval of the use of invective statements, however, even when they are based on the evidence. In this case, the State's Attorney's statements could be said to be based on the evidence, but the statements were not relevant to the defendant's guilt or innocence and could only have been used to inflame the jury's passions and prejudice them against defendant. Where statements made in closing argument serve no purpose except to inflame the jury, the statements constitute error. *Earll v. People* (1881), 99 Ill. 123, 135; see *People v. Smothers* (1973), 55 Ill. 2d 172, 176.

The error, however, does not warrant reversal of the judgments. "[I]mproper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused." (*People v. Baptist* (1979), 76 Ill. 2d 19, 29.) Here, as in *Baptist,* the evidence of guilt was combined with a highly incredible defense and the defendant's inconsistent testimony. Under these circumstances the prosecutorial indiscretion shown does not constitute reversible error.

Defendant next contends that the method used to select the jury deprived him of the right, under the sixth and fourteenth amendments, to a fair trial by an impartial jury. Although a new jury was later chosen for sentencing, defense counsel's request for separate juries at trial and sentencing was originally denied, and *voir dire* examination was conducted as though the veniremen would be responsible for sentencing defendant. In accordance with the guidelines established in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the veniremen were asked whether they had any scruples against imposing the death penalty. The People excused some jurors peremptorily who indicated they had such scruples, and others were challenged for cause. Defendant claims that the exclusion of prospective jurors for cause pursuant to *Witherspoon*

and the exclusions resulting from the two peremptory challenges made by the prosecution produced a jury biased in favor of conviction. The theory of the "conviction-prone" jury has been repeatedly rejected by this court (*People v. Gaines* (1981), 88 Ill. 2d 342, 358; *People v. Lewis* (1981), 88 Ill. 2d 129, 147, and cases cited therein) and nothing argued or cited by defendant presents reason to depart from these holdings. Defendant also specifically contests the exclusion of one prospective juror for cause on the ground that, as required by *Witherspoon,* her comments failed to demonstrate unequivocal opposition to the imposition of the death penalty. It is unnecessary to determine whether the particular exclusion objected to by defendant falls within the limitations of *Witherspoon,* since those limitations do not affect the validity of convictions. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 147; *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521.) After examining the transcript of the *voir dire* proceedings we find no basis to conclude that the jury chosen was incapable of impartiality on the issue of guilt and that defendant's convictions should be reversed on the ground that he was deprived of his constitutional right to trial by an impartial jury.

Defendant next contends that his convictions for armed violence must be vacated because his convictions for armed robbery and armed violence were based on the same act, taking property from the victim while armed with a dangerous weapon.

Section 33A—2 of the Criminal Code of 1961 provides:

"Sec. 33A—2. Armed violence—Elements of the offense. A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2.)

The armed violence counts charged that defendant, "while armed with a dangerous weapon, a gun, a category 1 weapon, *** took property *** from the presence of ***

by the use of force in violation of paragraph 33A—2, chapter 38, Illinois Revised Statutes." The armed robbery counts charged that defendant, "while armed with a dangerous weapon, a gun, took property *** from the presence of *** by the use of force, in violation of paragraph 18—2(a), chapter 38, Illinois Revised Statutes." In view of our holding that the conviction for the armed robbery of Debra Brown must be reversed, there is no underlying felony to sustain the conviction for armed violence and the judgment must be reversed.

Subsequent to the argument of this case we decided *People v. Donaldson* (1982), 91 Ill. 2d 164. We said in *Donaldson*:

> "In the absence of a clear legislative expression to the contrary we hold that multiple convictions for both armed violence and the underlying felony cannot stand where a single physical act is the basis for both charges." (91 Ill. 2d 164, 170.)

Accordingly, the conviction for the armed violence against Nersesian is vacated.

In his opening brief defendant contends that a death sentence imposed on a theory of accountability is violative of the eighth and fourteenth amendments to the United States Constitution, article I, section 11, of the Illinois Constitution of 1970, and the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 1—1 *et seq.*). Following the decision in *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, defendant obtained leave to cite additional authority. He argues that the People's theory of the case, and the theory on which the jury was instructed, was that defendant was accountable for the Brown and Nersesian deaths. He argues that the evidence fails to show any plan or intent to kill either Nersesian or Miss Brown or that he performed the acts which resulted in their deaths. He contends that his position is no different than that of Enmund in that he did not plan or participate in the deaths of the robbery victims. In their response

the People argue that "even if defendant lacked the requisite intent to murder Samuel Nersesian and Debra Brown sufficient aggravating factors were present to allow imposition of the death penalty without offending *Enmund*."

In *Enmund* the court said:

"[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not." 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.

Unlike the defendant in *People v. Ruiz* (1982), 94 Ill. 2d 245, defendant was not shown to have planned or in any manner participated in the killings, and under the authority of *Enmund* the death sentences must be vacated.

For the reasons stated, the judgments of the circuit court finding defendant guilty of the murders of Samuel Nersesian and Debra Brown and the armed robbery of Samuel Nersesian are affirmed, the judgments of conviction for armed robbery and armed violence as to Debra Brown are reversed, and the judgment of conviction for armed violence as to Samuel Nersesian is vacated. The cause is remanded to the circuit court of St. Clair County for the imposition of sentences other than death for the convictions for murder and for the imposition of sentence on the conviction for armed robbery.

*Affirmed in part and reversed in part and vacated in part; cause remanded, with directions.*

JUSTICE MORAN, dissenting:

I disagree with that portion of the majority opinion which holds that under the authority of *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct.

3368, defendant's death sentences must be vacated. It seems to me that the majority places upon *Enmund* too narrow an interpretation. Further, the circumstances in that case are clearly distinguishable.

In *Enmund*, the two victims were shot to death by defendant's codefendants during the course of a robbery. The murders occurred only after one of the victims shot and wounded a codefendant. Thus, there is every reason to believe that the murders were an unplanned and spontaneous reaction. Defendant Enmund participated in the offense to the extent that he drove the getaway car. He was not present at the scene of the crime. The Florida Supreme Court found no evidence that he planned the robbery.

In the instant case, Elem testified that defendant suggested the idea of robbing the proprietor of a cleaning store. Although defendant's testimony differed considerably on this point, the jury was not required to believe him. There was evidence from which the jury could infer that defendant participated in planning the offense. Further, unlike Enmund, he was present, at least part of the time, during the commission of the offense. The evidence indicates that he stole the "mail lady's" jeep and a television set. Clearly, defendant participated in the offense to a greater degree than was the case for Enmund.

More importantly, Elem testified that defendant shot Stoltz just prior to the cleaning-shop robbery. That shooting took place during the course of robbing the victim. Shortly thereafter, defendant and Jones entered the cleaning shop, again with the intent of robbing someone. The majority notes defendant's "apparent knowledge of the fact that Jones might harm [the mail lady]." (94 Ill. 2d at 315.) It is difficult to believe that defendant did not anticipate that life would be taken or lethal force employed.

As a majority of the Supreme Court stated, in reversing Enmund's death sentence: "It would be very different

if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." (*Enmund v. Florida* (1982), 458 U.S. 782, 799, 73 L. Ed. 2d 1140, 1153, 102 S. Ct. 3368, 3378.) In the instant case, I cannot help but conclude that there was a substantial likelihood that a killing would occur. Under these circumstances, *Enmund* should not be read to preclude imposition of the death sentence.

Further, it should be noted that defendant in the instant case received the death penalty for murdering two or more individuals. Thus, contrary to *Enmund,* the sentence was not imposed solely because an unintended death occurred during the commission of a felony. See *People v. Ruiz* (1982), 94 Ill. 2d 245, 269.

I fear, too, that the application of *Enmund* to the instant case sets an unfortunate precedent. It will be difficult indeed to impose the death penalty for any unwitnessed murder in which defendant is not the actual "triggerman." This is so despite the fact that defendant just murdered one victim during the course of a separate robbery, and although he was present during, and actively participated in, the offense in question. The position adopted by the majority benefits those defendants who are careful not to leave any witnesses to the crime.

For these above-related reasons, I would affirm the imposition of the death penalty in this case.

CHIEF JUSTICE RYAN joins in this dissent.