(No. 54276.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. GIRVIES L. DAVIS, Appellant.

*Opinion filed February 18, 1983.—Rehearing*
*denied April 8, 1983.*

2

10

Daniel D. Yuhas, Deputy Defender, and Charles M. Schiedel, Lawrence Bapst, and David Bergschneider, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant, and Girvies Davis, *pro se.*

Tyrone C. Fahner, Attorney General, of Springfield (Herbert L. Caplan, Melbourne A. Noel, Jr., Darrell Panethiere, and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Girvies Davis, was indicted with a codefendant, Richard Holman, age 17, in the circuit court of St. Clair County for one count of murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)). The causes were severed, and the charges against Holman were later dismissed pursuant to a motion by the State. Defendant was tried by a jury and found guilty of murder. At a separate bifurcated sentencing hearing, the same jury unanimously determined that the necessary aggravating factors existed, and that there were no mitigating

circumstances sufficient to preclude imposition of the death penalty. The jury returned a verdict directing that defendant be sentenced to death, and the court entered judgment on the verdict. Defendant's post-trial motions were denied, and he brings a direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603), alleging numerous errors in all stages of the proceedings.

The evidence adduced at trial indicates that on Friday, December 22, 1978, the victim, 89-year-old Charles Biebel, was shot to death in his mobile home located off Route 161. Jean Biebel Moore, the daughter of the deceased, testified that she discovered her father's body at 4 p.m. She stated that two watches, a billfold, "a number of guns," and a television set had been taken from his home. On cross-examination, she indicated that she had offered a $5,000 reward for information leading to the arrest and conviction of her father's murderer.

Gregory Mitchell, who testified that he was a "fence," stated that in late January of 1979, the defendant phoned him and said "we might have something for [you] later on." That evening, Holman brought Mitchell a gun. Mitchell further stated that he saw defendant later that same night, and defendant inquired as to how much money Holman was paid for the gun. He also testified that he again saw defendant on September 10, 1979, in the company of police officers. At that time, defendant told him to turn over to the police "any of the guns or T.V.'s" because Holman accused him of "doing some crimes."

Mitchell stated that a police officer gave him money to buy back the gun which he had sold to another individual. He did so, and the weapon was introduced into evidence at trial. Mitchell identified the gun as the one he purchased from Holman. One of the victim's neighbors, William Imboden, testified that this weapon belonged to the victim.

The State was permitted at trial to introduce evidence of two other murders for the limited purpose of showing defendant's *modus operandi*. One of the victims, Frieda Mueller, was 78 years old at the time of her death. She lived off Route 163. Mueller was found shot to death on the afternoon of Friday, December 8, 1978. A television set, billfold and checkbook were stolen. Evidence of this crime, which occurred two weeks prior to the Biebel murder, was also admitted to show defendant's knowledge that a murder was contemplated because previously, under similar circumstances, a murder did take place.

Similarly, Esther Sepmeyer was an elderly woman who lived in a rural area off Route 162. Her grandson, Rodney Sepmeyer, testified that Mrs. Sepmeyer was shot to death on Friday, July 13, 1979. A television set, replica antique radio, stereo, lawnmower and a .22 Remington rifle were taken from the home. The lawnmower and radio were introduced into evidence and identified by the witness. These items had been recovered from defendant's home pursuant to a search warrant. The witness also drew a picture detailing the inside of the victim's home. Further evidence disclosed that a latent fingerprint recovered from the home belonged to Holman. No fingerprints matching defendant's were found.

James Lay, chief investigator for the St. Clair County sheriff's department, testified that pursuant to defendant's request, he spoke with him at approximately 10 p.m. on September 9, 1979. Defendant was read his *Miranda* rights and signed a form indicating that he understood them. Defendant then stated that he had information regarding certain murders in which he was involved. The defendant gave Lay a list of crimes involving robberies, burglaries and shootings. He disclosed various locations at which evidence of the crimes could be found,

but none of the items described were recovered. Pursuant to defendant's description, Officer Lay drew a sketch of the inside of the Sepmeyer home. This picture was later circulated to the jury along with the sketch drawn by Rodney Sepmeyer. Lay further testified that on September 10, 1979, defendant dictated three statements to police officers admitting complicity in the Sepmeyer, Mueller and Biebel murders. On cross-examination he stated that six months earlier defendant had denied involvement in the Biebel murder and had stated that he could not locate the victim's home.

The defendant's statements regarding the Biebel, Mueller and Sepmeyer murders were read to the jury. Defendant gave the following statement concerning the December 8, 1978, Mueller murder:

> "Me, Girvies L. Davis, and Richard Holman drove my blue '70 Buick to a farm house off of Route 163 on the Centreville side of Millstadt. We turned to the right on a back road and pulled up in the driveway to the left. We got out of the car and went to a side or back door and pushed it open. This door opens into the kitchen. Once we got in, an old lady was coming towards us from the bedroom. I started to search the house when Ricky told the old lady to sit in a chair in the kitchen. We took some items, I think a T.V. from the kitchen. While I was taking the T.V. out to the car, Ricky said he shot her in the back. I heard the shot from outside. The lady was sitting at a small desk in the kitchen. He took some items, I think a T.V. from the kitchen. *** Ricky took a black man's wallet from the desk drawer ***."

With reference to the December 22, 1978, Biebel murder, defendant dictated the following statement:

> "Sometime in 1978, I don't remember exactly, me and Richard Holman drove up to a mobile home by a church. I was driving my blue Buick, 1970 model. We stopped in the driveway of the trailer. We got out of my car and we walked to the trailer. The front door was open, so we walked in. There was an old man sitting in a wheelchair facing the front door. I asked him where the money was.

He said he didn't have any. We took a double barrel shot-gun and a T.V. I was in the bedroom in the front room, and inside of the trailer was the kitchen on the right of the front door. Then the living room, then a bedroom down the hall to the left. The T.V. was in the front room, and the shotgun was in the bedroom. I carried the T.V. and gun out to the car. Then I heard a shot and Ricky came out and said he shot the old man. He sold the T.V. and gun somewhere but I can't remember where."

Regarding the circumstances of the July 13, 1979, Sep-meyer murder, defendant stated:

"[A]bout two months ago a friend of mine by the name of Ricky Holman who also goes by the name of Ricky Shaw, and I were driving in my 1970 Buick 225. We were driving on the interstate and I remember seeing a sign that said, St. Jacob on it. We drove past this and then we exited the highway by some service stations. We drove down this road until we came to an old house. It was sitting on the right side of the road. This house had a barn sitting in the back. I drove into the driveway and drove to the back of the house with the front of the car facing the back door. Both Ricky and I got out of the car and went up to the back door. I can't remember if we had to force the door open or not, but we went into the house. The back door leads into a kitchen and from the kitchen I could see that there was an old lady laying in a bed in a bedroom next to the kitchen. Ricky and I both walked into the bedroom right away. I went into the bedroom for a short time and then I started looking around the rest of the house and Ricky stayed in the bedroom. After I left the bedroom, I walked into the dining room and then in the spare room, and then into a hallway. The hallway had stairs leading to the upstairs but I never went upstairs. In the spare room there was a lawn mower, it was yellow with a three and a half h.p. motor. I took the handle off this lawn mower and then I carried it outside and put it in the trunk. While in the back room, I saw a motor thing with a black hose on it. I believe it was used to suck water and things up, but I didn't take it. In the hallway there was a turn table sitting on a heater. I can't recall what name it was, but it had a plastic top and it had a

top on it and I loaded it into the car. After I loaded the record player in the car, I came back in and got a T.V. that was sitting in the kitchen. The T.V. was sitting on a table just to the right of the door when I walked into the kitchen the T.V. was a little white T.V. with black trim around it and it's a color T.V. When I first went into the bedroom with Ricky, I found a .22 new rifle in a box. This gun was in a cabinet in the bedroom and there were also some shells with it. I loaded the gun and gave it to Ricky. When I was outside putting the T.V. in the car, I heard a gunshot and when I got back in the bedroom, the old lady was shot and she was laying on the bed. At the time I told Ricky, let's get out of here. Again when I first went in the house, I saw an antique type radio in the bedroom and I unplugged it and sat it in the kitchen table. Just as we were leaving the house the last time, I grabbed the radio and took it. Ricky never said why he shot the lady and I never asked. The old lady in the house looked very old and I think she was wearing a long flowered type dress. Early, while Ricky and I were in the house, Ricky asked me what we were going to do with the old lady and I told him, just leave her because she couldn't identify us. After we left the house, we drove to Perry's Lounge at 9th and Exchange in East St. Louis. I believe we sold the T.V. set there for about Eighty Dollars. After we left Perry's Lounge, we drove up to the pay bridge and we drove halfway across and then Ricky threw the .22 rifle into the river. The lawn mower and radio I kept at my house and I'm not sure where the record player went to. I understand that I have the right to talk with a lawyer and have him here. But I want to turn State's evidence and get exactly, get everything off my mind."

Defendant called as witnesses Dennis Kuba and Gerald Johnson, two special agents with the Illinois Division of Criminal Investigation. They testified that Lawrence and Harris, two men with whom defendant shared a cellblock, were convicted of other crimes to which defendant confessed. (The theory of the defense was that defendant merely heard about the Mueller, Biebel and Sepmeyer murders from his cellmates and, for some reason, confessed to

being one of the perpetrators). Kuba also testified that Lawrence and Harris were not in custody on the date the Biebel and Mueller murders were committed. On cross-examination, Kuba stated that Lawrence and Harris were in custody at the time of the Sepmeyer murder.

The final defense witness, a friend of defendant, identified the lawn mower and radio taken from the Sepmeyer home. He stated that, while he was at defendant's home, defendant bought these items from his cousin. On cross-examination, the witness testified that he could not hear the conversation, but he saw the defendant hand his cousin some money after looking at the items.

The first issue we address is whether the State's use of peremptory challenges to allegedly obtain an all-white jury deprived defendant of his right to a fair and impartial jury. This contention has been resolved adversely to the defendant in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824. In *Swain*, the Supreme Court held that, in a particular case, the prosecutor may constitutionally exercise his peremptory challenges to eliminate blacks from the jury. (380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct, 824, 837; accord, *People v. Gaines* (1981), 88 Ill. 2d 342, 358, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285; *Commonwealth v. Henderson* (1981), 497 Pa. 23, 438 A.2d 951.) Only a systematic and purposeful exclusion of blacks from the jury, "in case after case," raises a question under the fourteenth amendment. (*Swain v. Alabama* (1965), 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837.) Defendant has the burden of producing some evidence establishing a systematic exclusion (*People v. Powell* (1973), 53 Ill. 2d 465, 477-78), and he has not met that burden here.

The evidence indicates that three prospective black jurors were peremptorily challenged by the State. The record does not reveal the number of black jurors called for service. Nor is there evidence that the jurors were neces-

sarily excluded because of their race. In objecting to the jury panel, defense counsel merely stated: "I believe the number of the jurors which were black were excused by the State." Defendant's post-trial motion for a new trial simply alleged that three black jurors were peremptorily challenged by the State.

We recognize that at least two States, California and Massachusetts, have rejected the *Swain* holding. These courts have concluded that if defendant makes a *prima facie* showing that veniremen were excluded because of race, the prosecution has the burden to prove the exclusion was based on other grounds. (*Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170; *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890.) However, we are not disposed to depart from the principle enunciated in *Swain.* "Peremptory challenges, historically and by definition, are arbitrary and perhaps even irrational challenges to the seating of a juror. They are totally subjective and not subject to scrutiny or examination. *** [T]he Court in *Swain* pointed out that to entertain objections of the nature raised in this case would be to destroy the peremptory nature of the challenge ***." *Commonwealth v. Henderson* (1981), 497 Pa. 23, 29-30, 438 A.2d 951, 954.

Defendant further contends that he was denied a fair trial when the prosecutor, over a defense objection, allegedly questioned prospective jurors about their willingness to follow the law of accountability. It is clear that during *voir dire* "[q]uestions shall not directly or indirectly concern matters of law or instructions." (73 Ill. 2d R. 234.) Two of the jurors who were ultimately selected were asked the following question:

> "Mr. Kuehn [State's Attorney]: Now, there's going to be—there's going to be evidence involved in this case of a co-defendant, another defendant apart from this defendant. Some of the evidence will pertain to that co-defend-

ant and how it relates to this defendant's case, and evidence that runs to this defendant. The law in certain instances would provide that a person would be held responsible for the acts of a co-defendant, a cohort in crime.

\* \* \*

\*\*\* The Court will instruct you about this, this aspect of the law, that a person can be held accountable and responsible for the acts of another. Would it affect your ability in deciding this case on the issue or the charge of murder provided that the law states that the defendant could be held accountable under the facts that the defendant, this defendant before you, did not do the direct act, did not pull the trigger of the gun so to speak, that caused the death of the individual. Do you think that would affect your ability to decide or could you follow that law?''

The prosecutor did not instruct the jury as to the applicable law. Rather, he merely inquired as to whether the jurors could follow the law even if the evidence revealed that the defendant did not actually do the shooting. We do not agree that the quoted comment improperly concerned the law of accountability.

Defendant next contends that exclusion of veniremen for cause, pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, improperly results in a conviction-prone jury. We have consistently held to the contrary (*e.g., People v. Lewis* (1981), 88 Ill. 2d 129, 147, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307), and recently affirmed our prior holdings. *People v. Tiller* (1982), 94 Ill. 2d 303; *People v. Free* (1983), 94 Ill. 2d 378.

Defendant's final assignment of error with respect to the *voir dire* concerns the trial judge's refusal to excuse a juror for cause. Defense counsel, in his opening remarks, informed the jury that defendant had been in jail with two men who were convicted of attempted murder in connection with the robbery of a gas station. He further indicated

that certain tests revealed that the gun used in the robbery had also been used in a murder at the Mexico City Cafe, and may have been the weapon used to kill Frieda Mueller.

After Jean Biebel Moore testified, the court recessed. During this recess, a juror, Mr. Lewis, informed the court that a friend of his was related to someone who was murdered during the Mexico City Cafe incident. The judge asked Mr. Lewis if that incident would affect his decision in the case, and he responded:

> "Well, the only thing I can say there is that at the time, like I say, this individual and I became close friends \*\*\*. He was pretty bitter about the incident because he would have been there had he stopped, he apparently decided to go home that night. I would like to say, no, that I can keep an open mind on it, but I don't know at this time. But I do know that he was very bitter at the time."

He further stated, in response to an inquiry by defense counsel, that any decision he made would not result in embarrassment to him because of his friendship. When asked if he could put the incident completely out of his mind and arrive at a fair verdict, Mr. Lewis replied:

> "I don't think I could ever put it totally out of my mind because it was somebody near to me and I'm not used to this type of situation. But I think for this case, since it is a separate case, I think I could look at this case—the only reason I brought it up is because it was made mention and I do recall the incident."

He also indicated that he was not personally acquainted with the victim. Following this exchange, defense counsel requested that Mr. Lewis be excluded from the jury and replaced by one of the alternate jurors. The court denied this request.

It cannot be said that the judge erred in permitting Mr. Lewis to serve as a juror. The trial judge is in a superior position to observe the venireman's demeanor. (Cf. *People v. Gaines* (1981), 88 Ill. 2d 342, 357 (trial judge is in a superior position to determine a venireman's attitude toward

the death penalty).) Although initially equivocal and hesitant, Mr. Lewis' final response indicated that he could view defendant's trial as a "separate case." The fact that he could never put the incident completely out of his mind does not reflect on his impartiality with respect to this trial. See *People v. Szabo* (1983), 94 Ill. 2d 327 (prospective juror should not have been excluded, pursuant to *Witherspoon*, because of equivocal and tentative statements concerning her ability to impose the death penalty).

Defendant further alleges as error the prosecutor's reference, in his rebuttal closing argument, to the Mueller and Sepmeyer murders. In closing argument, defendant frequently insinuated that the police officers fabricated the confessions attributed to defendant, that they committed perjury, and that defendant was innocent. In rebuttal, the prosecutor basically stated that he was not prosecuting defendant because he was innocent, or because he was an "altar boy." The prosecutor then stated:

"Mr. Kuehn: Why do we [the State and police officers] want [the defendant]? Because there are only three rural killings of old people, defenseless old decrepit, aged people, in 1979, and the last one was Sepmeyer, and he details them all, and he's a good friend of Ricky Holman, and they were out killing. That's why we want him."

Defendant objected to this comment. He does not argue in this court that the "other crimes" evidence was improperly admitted, but rather that it was argued for an improper purpose. He contends that the prosecutor's comment indicated that defendant should be found guilty of the Biebel murder because he was involved in two other murders. The State urges that, considering the comment in its context, the statement merely refers to defendant's knowledge and *modus operandi*.

Even if we were to agree with defendant, still, there would be no reversible error. The comment was "not so inherently prejudicial that no instruction could have corrected the situation." (*People v. Lewis* (1981), 88 Ill. 2d

129, 149.) Here, the trial judge carefully instructed the jury that the evidence pertaining to the Mueller and Sepmeyer murders had "been received solely on the issue of the defendant's design and knowledge" and was to be considered only for that limited purpose.

Defendant has filed a *pro se* brief raising numerous issues concerning the guilt phase of the proceedings. We will address those contentions which were not raised by defense counsel. Defendant asserts that his right to a speedy trial was violated and cites sections 103—5(a) and (b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, pars. 103—5(a), (b)). These provisions state that a defendant must be brought to trial within 120 days from the date he was taken into custody, or, if defendant is not in custody, within 160 days from the date he demands trial. Neither of these subparagraphs are applicable in the instant case since they involve situations in which a person is charged with a single offense. The relevant statutory provision is section 103—5(e), which states in part:

"If a person is simultaneously in custody upon more than one charge pending against him in the same county, or simultaneously demands trial upon more than one charge pending against him in the same county, he shall be tried, or adjudged guilty after waiver of trial, upon at least one such charge before expiration relative to any of such pending charges of the period prescribed by sub-paragraphs (a) and (b) of this Section. Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered pursuant to Section 118—1 of this Act or, if such trial upon such first charge is terminated without judgment and there is no subsequent trial of *** such first charge within a reasonable time, the person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which such trial is terminated; if either such period of 160 days expires without the commencement of trial of *** any of such remaining charges thus pending, such charge or charges shall be dismissed

and barred for want of prosecution unless delay is occasioned by the defendant ***." Ill. Rev. Stat. 1977, ch. 38, par. 103—5(e).

The relevant records have not been supplied to us in this proceeding. In order to resolve this issue, we will examine the records in defendant's other murder trials from the pleadings, pertaining to such cases, contained in the record before us.

The defendant was taken into custody on August 30, 1979, on one of the three pending murder charges. He conceded, during the pretrial hearing, that he was brought to trial on the initial murder charge within the prescribed time period. He was found guilty, but on either February 2 or 4, 1980, the trial judge granted defendant a new trial. Following a substitution of judges, the retrial began on March 24, 1980, and resulted again in a guilty verdict rendered on March 27. Post-trial motions were denied on May 2, 1980, and defendant was apparently sentenced on that date.

On March 10, 1980, prior to the retrial on the first charge, defendant was tried on the second murder charge. He was convicted on March 11, and sentenced on April 25, 1980. His trial on the instant charge was scheduled to commence on August 25, 1980. However, on August 22, defendant moved for a change of venue, which motion was granted. The trial judge scheduled trial for October 20, 1980, in a different county. On September 19, defendant withdrew his motion for a change of venue, and the trial was rescheduled in St. Clair County for the week of October 14, 1980. Numerous pretrial motions were filed by defendant and argued on October 10 through 16. The jury was selected on October 20, after which the trial began.

As quoted above, section 103—5(e) states that a defendant "shall be tried upon all of the remaining charges thus pending within 160 days from the date on which *judgment* relative to the first charge thus prosecuted is rendered pursuant to Section 118—1 of this Act." (Emphasis added.)

Although section 118—1 has been repealed (in a manner that has no bearing on the disposition of this issue) "judgment" is defined in section 102—14 of the Code of Criminal Procedure of 1963 as "an adjudication by the court that the defendant is guilty or not guilty and if the adjudication is that the defendant is guilty it includes the sentence pronounced by the court." (Ill. Rev. Stat. 1977, ch. 38, par. 102—14.) The term "judgment," as used in section 103—5(e), refers to the date upon which defendant was first sentenced, and not the date upon which he was granted a new trial. See also *People v. Allen* (1978), 71 Ill. 2d 378, 381; *People v. Martin* (1976), 44 Ill. App. 3d 207, 208; *People v. Ike* (1973), 10 Ill. App. 3d 933, 934.

The first trial ended in a new trial, and therefore there was no judgment. Consequently, defendant received his first sentence on April 25, 1980. The State had 160 days from that date in which to try defendant for the instant offense. Defendant's August 22 motion for a change of venue was clearly a delay occasioned by defendant and operated to toll the statute. (See Ill. Rev. Stat. 1977, ch. 38, par. 103—5(f).) On that date, 119 days had lapsed since April 25. The statute commenced running again, at the earliest, on September 19, when defendant withdrew his motion for change of venue. It was later tolled from October 10 through 16, when defendant's pretrial motions were argued. Four more days lapsed from October 16 until the trial commenced. According to our calculation, the limitations period had run for 144 days. This is within the 160-day limit prescribed by the statute.

At the pretrial hearing, defendant also alleged that he was not retried on the first murder charge within a reasonable time, as required by section 103—5(e). Although there was approximately a seven-week delay between trials, we agree with the trial judge that this was not unreasonable in view of the circumstances. Defendant had at least three murder charges pending and was tried on one

such charge prior to his retrial. This is not, therefore, a situation in which the State "sat" on defendant's case without attempting to pursue any prosecution. For these reasons, we find that defendant's right to a speedy trial was not violated.

Defendant further contends that the indictment was insufficient because it charged him with murder when he was only guilty of home invasion or burglary. Clearly, the prosecutor has discretion to determine the offenses with which a person shall be charged, and here the indictment was sufficient upon which to predicate a murder conviction.

Prior to trial, defendant moved for a substitution of judge on the grounds that this same judge presided over an unrelated murder trial of Holman. This motion was denied. After the jury returned a verdict imposing the death penalty, defense counsel inquired as to whether the judge could set aside the jury's verdict. The judge indicated that he need not determine whether he could substitute his judgment for that of the jury and stated: "*** Mr. Davis is a no-good, cold-blooded killer that doesn't deserve to live." Defendant contends that this post-trial statement proves that the judge had been prejudiced against him, and therefore his pretrial motion for a substitution of judge should have been granted.

Without commenting on the propriety of this statement, it does not indicate that the judge was predisposed against the defendant during trial. Our review of the record does not disclose any instances of inappropriate judicial behavior, or intentional unfair treatment of the defendant. Consequently, there was no error in disallowing a substitution of judge.

It is also contended that defendant's statements should have been suppressed because they were involuntary, and his right to counsel was violated. We disagree. Defendant's initial contact with Sergeant Lay, to whom he confessed re-

garding a number of crimes, was initiated by defendant himself. The evidence shows that defendant was advised of his *Miranda* rights, including the right to counsel, and he signed forms indicating that he understood them. Although, at a pretrial hearing, defendant testified that the police and certain inmates threatened and coerced him into confessing, there is no corroborating evidence to support this claim. Clearly, a question of credibility was involved, and the trial judge was not required to believe defendant's version of events.

Nor was the court required to assume the confessions were involuntary because defendant was questioned from 10 p.m. on September 9, until 4 a.m. the following morning. Although defendant gave a written statement at 4 a.m., he indicated a willingness to discuss the crimes from the moment he met, at his own request, with Sergeant Lay. Indeed, as soon as the interview began, he handed Lay a list of crimes in which he claimed involvement. It has been held that "[t]he finding of the trial court on the voluntariness of a confession will not be disturbed unless it can be said that it is contrary to the manifest weight of the evidence." (*People v. Brownell* (1980), 79 Ill. 2d 508, 521, *appeal dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59, citing *People v. Aldridge* (1980), 79 Ill. 2d 87; *People v. Medina* (1978), 71 Ill. 2d 254, 258.) There was sufficient evidence from which the judge could conclude the defendant voluntarily, in all respects, gave the inculpatory statements. The judge, therefore, did not err by allowing the statements into evidence.

Defendant argues that his fourth amendment rights were violated when police officers executed a search of his home beyond the scope of the warrant. Evidence at the pretrial hearing disclosed that a search warrant was issued, authorizing the officers to seize a color television set from a front room in defendant's home. Probable cause for issuance of the warrant was based on statements given by

Ricky Holman. The officers did not find the television set, but they did seize a gold watch and knife. Defendant's motion to suppress these items as evidence was granted.

While in the home pursuant to the search warrant (which defendant does not contend was improperly issued), an officer noticed a replica antique radio, a lawnmower and a stereo turntable. It subsequently became known that items similar to those found in defendant's home were reported stolen from the Sepmeyer residence. A new search warrant was issued, authorizing a seizure of those items. Defendant claims that this seizure was improper because the officer's search should have been restricted to the room in which the television set was located.

If the items taken from the Sepmeyer residence were seized at the time they were discovered, the trial judge may well have suppressed this evidence, as he suppressed the watch and knife. However, they were not recovered by the police at that time; they were simply observed during the course of an authorized search. We therefore cannot say that the seizure of the items was invalid. In a related contention, defendant challenges the validity of the seizure on the grounds that he did not consent to the search. However, the search was conducted pursuant to a warrant, and his consent is therefore unnecessary. The case upon which defendant relies, *People v. Rinaldo* (1980), 80 Ill. App. 3d 433, is inapposite because it involved a warrantless search.

It is further asserted that certain police officers and the State's Attorney conspired to violate defendant's rights, and that the State's Attorney intimidated Mitchell into lying about the defendant in order to obtain a conviction. These conclusional allegations are not supported by the record and are without merit.

Defendant also contends that Mr. Kuehn or the police officers lied about his role in the Biebel murder in order to obtain the $5,000 reward which was offered by the victim's daughter. Although such a reward was offered, there is no

evidence from which an inference of misconduct can be derived. Also without merit is defendant's argument that Mitchell should have been arrested as an accessory to the crime. Whether or not the State chooses to prosecute Mitchell is irrelevant to the disposition of defendant's case.

Defendant makes a conclusional statement that he was prejudiced by the introduction into evidence of the murder victim's pictures, the shotgun taken from his home, and the "testimony." He offers no support for the allegation and our review reveals none.

Finally, defendant contends that a verdict should have been directed in his favor at the close of the State's case, and that the evidence was insufficient to support a conviction. The evidence, if believed by the jury, establishes that defendant contacted Mitchell concerning the purchase of a gun, which was delivered by Holman. The gun was one of the items taken from the deceased's home. Certain items stolen from another victim were recovered from defendant's home. Especially significant is defendant's inculpatory statement, in which he details the circumstances of the murder in such a manner as to clearly indicate that he was present during the commission of the offense. For example, he stated that the door to the Biebel home was unlocked, and the victim's daughter testified that it was left open during the daytime. He knew that the victim was confined to a wheelchair, and corroborated the daughter's testimony with respect to certain items taken. The only evidence presented by the defense does not raise a reasonable doubt as to defendant's guilt.

It is for the trier of fact to determine the weight and sufficiency of the evidence (*People v. Akis* (1976), 63 Ill. 2d 296), and that determination will not be reversed unless the evidence is so improbable as to create a reasonable doubt of defendant's guilt (*People v. Yarbrough* (1977), 67 Ill. 2d 222). From our review of the record, we find the evidence was more than sufficient to support a murder con-

viction. It follows that the judge did not err in denying defendant's motion for a directed verdict.

Having determined that no reversible error occurred during the guilt phase of defendant's trial, we next consider allegations of error at the sentencing proceeding. Defendant raises a number of contentions concerning the constitutionality of the death penalty statute which have been resolved. This court has determined that the statute is not incompatible with article I, section 11, of the Illinois Constitution (*People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Gaines* (1981), 88 Ill. 2d 342); that the statutory grant of discretion and authority to the prosecutor is proper (*People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Brownell* (1980), 79 Ill. 2d 508; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603); that the State need not prove, beyond a reasonable doubt, that there are no mitigating factors sufficient to preclude imposition of the death penalty (*People v. Free* (1983), 94 Ill. 2d 378; see also *People v. Brownell* (1980), 79 Ill. 2d 508); and that the statute provides for adequate review to insure that sentences are not arbitrarily imposed. *People v. Kubat* (1983), 94 Ill. 2d 437; *People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Brownell* (1980), 79 Ill. 2d 508.

Defendant next argues that the indictment was insufficient to support a death sentence because it failed to allege a statutory aggravating factor. In *People v. Brownell* (1980), 79 Ill. 2d 508, 524, it was held that "[a]n indictment's allegations must be set out with such specificity or particularity that the accused is informed of the offense with which he is charged and enabled to prepare his defense and, further, that he is protected against being later prosecuted for the same crime."

Defendant, charged with one count of murder, does not assert that the necessary elements of that crime were insufficiently alleged in the indictment. Since "there is only

one offense of murder in Illinois; [and thus] no distinction is made between capital and non-capital murder" (*People v. Brownell* (1980), 79 Ill. 2d 508, 524; *People v. Kubat* (1983), 94 Ill. 2d 437), defendant, when properly charged, is protected from being twice prosecuted for the same crime. The aggravating factors are not necessary elements of the *offense*, and are relevant only to a determination of the appropriate *punishment*. Therefore, the real question concerns defendant's knowledge that the death penalty would be sought, and his ability to adequately prepare a defense. Had the State set forth in the indictment the aggravating factors upon which it would rely, notice would not be an issue. We therefore believe this procedure to be preferable.

When defendant raised this issue during the trial, the State responded:

> "MR. STURGEON [Assistant State's Attorney]: For the record, I would indicate that in response to a court order, an order of the Court, for a bill of particulars, the defendant prior to the commencement of this trial was advised of what the aggravating factors would be and what [*sic*] we would be seeking the death penalty, and so they would be apprised of it, which is the basis for what they are asking for, so I don't see any prejudice that would result from the failure to be in the indictment since they were fully advised prior to trial.
>
> THE COURT: Anything else?
>
> MR. YOUNG [Defense Counsel]: No."

Defendant did not deny the truth of the prosecutor's statement. Further, the bill of particulars requesting information concerning the State's intent to seek the death penalty was filed on October 7, 1980, prior to his trial. On October 16, 1980, he made a pretrial motion to declare the death penalty statute unconstitutional. Defendant does not allege that he was unaware of the aggravating factors upon which the State would rely. For these reasons, we find that he received sufficient pretrial notice of the aggravating factors. This is not, therefore, a situation in which

the indictment either failed to specify aggravating factors or defendant received no pretrial notice. Since defendant was informed of the above facts, and has shown no prejudice as a result of the State's failure to specify aggravating factors in the indictment, we hold that the indictment was sufficient upon which to predicate the death penalty. (*Cf. People v. Gaines* (1981), 88 Ill. 2d 342 (pretrial notice of the State's intent to seek the death penalty is not always required where the indictment apprised defendant that he could potentially be sentenced to death).) Defendant appears to recognize the shortcomings of his argument since he merely urges that we adopt the reasoning of the dissenting opinion in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603, and the partial concurrence and partial dissent in *People v. Greer* (1980), 79 Ill. 2d 103.

Defendant's next contentions concern the sufficiency of the State's proof with regard to the aggravating factors. During this stage of the sentencing hearing, the State introduced into evidence certified copies of two prior indictments and murder convictions. The documents indicated that a Girvies L. Davis was convicted for the murders of John Oertel and Frank Cash, and the attempted murder of James Ostman. In response to an inquiry by the prosecutor, an employee of the circuit clerk's office testified that the certified copies represented convictions of the defendant. Defense counsel did not cross-examine the witness as to the basis for her knowledge. Nor did he move to strike her testimony for failure to identify the defendant. However, he now alleges, as he did in a motion made while the sentencing jury was deliberating, that the State failed to establish that defendant is the same person named in the documents. He relies primarily on two appellate court cases for the proposition that an identical name in a document does not prove beyond a reasonable doubt the identity of the defendant as that person named in the docu-

ment. *People v. Martin* (1981), 97 Ill. App. 3d 704; *People v. Langdon* (1979), 73 Ill. App. 3d 881.

It has been held that, in addition to the presumption which arises from the similarity in names, independent proof must be made that defendant is the same person named in the certified records. (*People v. Casey* (1948), 399 Ill. 374, 378-79.) However, this court recently stated:

> "Earlier cases in this court would appear to preclude a judge from taking judicial notice of the orders or decrees entered in other cases in the court in which he presides. [Citations.] It has been repeatedly held that proof of prior convictions should be by means of certified copies of the record and identification of the defendant in the prior case as the same person. [Citations.] To the extent that these and similar holdings may be thought to create an inflexible rule requiring formal proof of earlier court records only by authenticated or certified copies of those records and proof of identity, they are incompatible with considerations of judicial economy and efficiency essential to the disposition of present-day caseloads. Nor do such procedures provide any necessary or useful safeguards to the defendants in cases such as this where the fact that the prior conviction had occurred has never been denied." *People v. Davis* (1976), 65 Ill. 2d 157, 164.

In the instant case, defendant did not deny the fact of his prior convictions or assert that he was not the same Girvies L. Davis named in the documents. Therefore, it is difficult to imagine how defendant could have suffered any prejudice as a result of the State's proof on the issue of identity. We adopt the general rule that identity of name gives rise to a rebuttable presumption of identity of person. See *People v. Cheek* (1982), 93 Ill. 2d 82, 90; 29 Am. Jur. 2d *Evidence* sec. 231 (1967).

Defendant next asserts that the State failed to prove that the prior murder convictions constituted aggravating factors which the jury could properly consider in determining whether to impose the death penalty. He urges us to construe the death penalty statute as requiring that, where

murders are unrelated, they must result from premeditated acts or, in the alternative, the killings must be intentional. Specifically, he argues that there is no evidence that the Cash and Oertel murders resulted from an intent to kill more than one person or from separate premeditated acts. The relevant portion of section 9—1 provides:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter.

(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

\* \* \*

3. the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts *so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts* \* \* \*." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a), (b)(3).

At first glance, the italicized portion of the statute would seem to support defendant's interpretation. However, for a number of reasons, we do not feel that the construction urged represents the legislative intent. Section 9—1(b)(3) initially states that a defendant (who attained the

age of 18 at the time of the offense) may be sentenced to death if he "has been convicted of murdering two or more individuals under subsection (a) of this Section." In subsection (a), murder is defined as an intent to kill or do great bodily harm, knowledge that the act creates a strong probability of death or great bodily harm, or death results during the commission of a forcible felony other than voluntary manslaughter. If we were to construe the italicized portion of the statute as limiting the murder convictions upon which a death sentence could be predicated, only those murders that fall under subsection (a)(1), and require an intent to kill, would qualify to support a death penalty. This would be the result since murder, as defined in part of subsection (a)(1), and in subsections (a)(2) and (3), does not require either an intent to kill or premeditation. Consequently a defendant could conceivably murder 10 people within the meaning of these subsections and yet never, according to defendant's interpretation, be eligible for the death penalty. This would be the result even though defendant *knew* his acts would result in death or great bodily harm. Despite the language of the statute, we cannot assume that the legislature intended to create such an anomaly. To so interpret the statute would substantially undercut the apparent legislative intent that two or more convictions for murder, falling within subsection (a), may support a death penalty.

Further, as the State points out, premeditation is not a recognized mental state in Illinois. The statute defining relevant states of mind in criminal offenses refers only to intent, knowledge, recklessness, negligence, and absolute liability. (Ill. Rev. Stat. 1977, ch. 38, pars. 4—4, 4—5, 4—6, 4—7, 4—9.) Consequently, there is no definition of murder which encompasses the concept of premeditation (see Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)), and the jury is never instructed thereon. For this reason, the legislature could not have intended that only unrelated murders which

result from premeditated acts may support a death sentence.

We do agree with defendant that the legislative language is not meaningless. We also believe that some mental state is required in order to impose the death penalty. House Bill 10, which was the bill to enact a statute for the imposition of the death penalty, originally provided that a defendant could be sentenced to death if he was convicted of murdering two or more persons, regardless of whether the deaths occurred as a result of the same act or of several related or unrelated acts. The original bill was amended by Senate amendment No. 2, which added the phrase "so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." As amended, House Bill 10 was passed by both houses, approved by the Governor, and enacted as Public Act 80—26 (1977 Ill. Laws 71). This legislative history indicates that some meaning is to be attributed to the added phrase. The legislative intent may best be discerned by a consideration of the Senate and House debates.

After the original bill had passed both houses, a subsequent vote was taken on the adoption of the Senate amendment. Senator Knuppel, describing the amendment, stated:

> "House Bill 10 as amended provides in paragraph three, thereof, that the defendant… when the defendant has been convicted of murdering two or more individuals, this is without reference to what his intent was or how it happened. Now, you've got a possibility of three situations. You got the possibility of a man who kills two people with two separate premeditated acts, you've got the situation where a man intends to kill two people as a result of one premeditated act, or you've got the case of an individual who intends to kill one person but as a result of his act, kills two. Now, the person who intends to kill only one person and we have a recent case in Carthage or over in that vicinity where a gentleman murdered a mother, an expectant mother, and there was a

seven month old child in her womb. That person actually, I'm sure, must have intended to kill only one person, or it's possible that I could aim a... a revolver at someone that I intended to kill... planned to kill and as a result of that shot, killed some innocent person who walked between there. Now, the result would be that I had one... premeditated intention to kill one person, but I, in fact, killed two. Now, I think that person is entitled to some kind of... of clemency because you've got the felony provisions where if he kills someone in the act of a felony, he still may be... he still may be guilty of a crime which would be punishable by death, but if he intends only to kill one person and *accidentally kills two,* I say his crime is no more heinous than the person who tends... intends to kill one person and actually kills one person. I think this amendment would strengthen the bill because it specifically now provides, so long as the deaths were the result of either an intent to kill two... kill more than one person or of separate premeditated acts. *It would take out of this classification that person who... who intended to kill one but through inadvertence killed two."* (Emphasis added.)

In proposing the adoption of this amendment, Representative Kosinski stated:

"Senate Amendment #2 is somewhat dependent oriented in as much as it eliminates *accidental* death of a second person or more in a *multiple murder.* I concur with that Amendment. ***" (Emphasis added.)

See also Final Legislative Synopsis and Digest 955 (1977 Reg. Sess. 80th Gen. Assem., S. Amend. No. 2).

The emphasized portions of the above quotations indicate the bill was amended to insure that a defendant would not suffer the death penalty where a multiple murder is an accidental consequence of a single act. In other words, the physical act leading to a multiple murder must be accompanied by a culpable mental state as to *each* murder. A defendant may not receive the death penalty for related, multiple murders where more than one person was accidentally killed. Thus, the intent of the amendment was to

address the problem of multiple murders committed at the same time.

In the instant case, defendant did not receive the death penalty because of his participation in a multiple-murder situation. He was convicted of three separate and unrelated murders. In the Cash murder case, he was convicted after the jury had been instructed solely on an intent-to-kill theory. In the Oertel case, the jury was instructed to find defendant guilty if he (or a person for whom he was responsible) intended to kill or do great bodily harm, or knew his act would cause death or great bodily harm. In the case at bar, the jury was instructed as to each murder theory, and it is therefore unclear upon which theory they found defendant guilty. We hold in this case that where, as here, defendant is convicted of two or more murders resulting from intentional *or* knowing acts, the death penalty may properly be imposed.

Defendant further contends that he was denied a fair sentencing hearing because the prosecutor misstated the law with respect to defendant's eligibility for the death penalty. In his remarks to the sentencing jury, the prosecutor stated that, "under the Illinois law, if you killed and are convicted of killing two or more persons, then it is a case that properly fits the death penalty where jurors should consider mitigating and aggravating circumstances as to that individual." Defendant did not object to this statement, and therefore failed to properly preserve the issue for review. (*People v. Lewis* (1981), 88 Ill. 2d 129, 149 (objections to prosecutor's argument not raised are waived).) Further, we find that the comment did not constitute error. The prosecutor was merely defining the general procedure employed in a bifurcated sentencing hearing.

Defendant alleges that he is entitled to a new sentencing hearing because he was prejudiced by evidence that a murder victim's wife delivered a baby the day after his death. This evidence was elicited through the testimony of

Mr. Ostman, an attempted-murder victim, and was briefly referred to in the prosecutor's closing argument. Defendant asserts that he objected to this evidence, but the basis for the objection is not disclosed in the record. The record does reveal that, after the witness stated the child's date of birth, defense counsel asked to approach the bench. A discussion was held off the record, following which the judge remarked: "I'll allow it. Go ahead." We will assume that, as the above exchange implies, a proper objection was registered.

We agree with defendant that comments and testimony regarding a deceased's family are generally improper. (*People v. Bernette* (1964), 30 Ill. 2d 359.) However, the evidence in question was not elicited during the guilt or innocence phase of the trial. Nor was it introduced during the first phase of the sentencing hearing, where the State must establish the existence of an aggravating factor in order to qualify defendant for the death penalty. The testimony was given in the second phase of the sentencing proceeding, in which the ordinary rules controlling the admissibility of evidence do not apply.

In *People v. Free* (1983), 94 Ill. 2d 378, as in the instant case, the State introduced testimony regarding the deceased's family in the second phase of the sentencing hearing. A witness described the emotional effects of the victim's death on the family, and stated that the family moved because it was unable to enter the old house; that the husband felt "completely shut out"; that the daughters would have no mother to relate to as they were growing up; that the victim's mother was depressed and took tranquilizers; and that one of the victims who survived no longer trusted people. The court, after noting that defendant failed to object to this testimony, went on to emphasize that the evidence was introduced in the second phase of the sentencing hearing. Defendant's death sentence was upheld. We decline to depart from the reasoning adopted in *Free*.

Further, we cannot say this evidence would have influenced the jury's verdict. The jury was aware that defendant had three murder convictions (for the Biebel, Oertel and Cash murders), an attempted-murder conviction, that he was convicted of burglary, of battery, and of a gun-violation charge. In view of this significant criminal history, it is not reasonable to believe that the jury, in voting for the death penalty, was influenced by the statements in question.

In a related contention defendant argues that, pursuant to *Henry v. Wainwright* (5th Cir. 1981), 661 F.2d 56, *cert. allowed* (1982), 457 U.S. 1114, 73 L. Ed. 2d 1326, 102 S. Ct. 2922, it is improper for a jury to consider nonstatutory aggravating factors. (*Henry* was remanded to the court of appeals for further consideration in light of *Engle v. Isaac* (1982), 456 U.S. 107, 71 L. Ed. 2d 783, 102 S. Ct. 1558.) We have recently determined that *Henry* is inapplicable "because our statutory procedure is different from that of Florida's death penalty law, under which the defendant in *Henry* was sentenced." *People v. Free* (1983), 94 Ill. 2d 378, 427.

Defendant further contends that he was denied a fair sentencing hearing by the introduction into evidence of a videotaped conversation between the defendant and State's Attorney Kuehn. Specifically, defendant argues that the tape was inadmissible because it contained evidence of a plea discussion, it violated defendant's right to silence and to be free from self-incrimination, and it violated his right to confrontation under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. We first address defendant's contention concerning the alleged plea discussion. Supreme Court Rule 402(f) provides:

> "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible

against the defendant in any criminal proceeding." 73 Ill. 2d R. 402(f).

The record indicates that the discussion in question was initiated by Mr. Kuehn, the State's Attorney, for the purpose of questioning defendant about various crimes, including the Biebel, Mueller and Sepmeyer murders. Defendant was informed of his right to have his counsel present, but he stated that he did not mind talking without his attorney. After being told his constitutional rights, defendant indicated that he had no personal knowledge of the crimes, and had learned about them from other people, particularly Ricky Holman. After further questioning, the following exchange took place:

"MR. DAVIS: Hey, like, if I plead to all this, what would happen to me though? That's what I'd like to know.

\* \* \*

MR. KUEHN: Well, if you plead to all these crimes, you would be pleading to more than one homicide, or the responsibility for it. If you were the active participant, in other words if you were the individual who actually did the shooting, you'd be subject to the capital punishment. The electric chair. However, you do have to be the active participant to receive the death penalty. In other words, you have to be the person who did the shooting.

MR. DAVIS: Okay. If I got, if I plead to all this and I got the death penalty, would they send me on, would they send me on and let me go ahead and do it?

MR. KUEHN: Well, is that what you want?

MR. DAVIS: Do I have to wait? Yeah, I [sic] rather have it, I would rather have it like that than wait. That's what I want, yeah, right.

MR. KUEHN: I don't understand something, Mr. Davis, I don't understand how you could detail all these things and remember all this from other people, and even if you did, why? Why would you have given all these statements implicating yourself after you knew that they could be used against you? Huh?

MR. DAVIS: I don't know.

\* \* \*

MR. KUEHN: Why?

MR. DAVIS: Like I said, I (inaudible) I'm, you know, willing to pay for what I done. Like those guns, you know, [i]f they were going to give me the chair or something, I [would] go on with it—go on and send me on down, let me get it over with. I don't want to wait or nothing. Nos [sic], that I would plead to all this if that would happen, but if that don't happen then, no, I'm not going to plead to it. And that's just it. Now, if that could be arranged in some kind of way, everything would be all right.

MR. KUEHN: Well, I don't understand. I don't understand you're saying in one sentence that you just heard this about other people, from other people, that you didn't really participate in any of these crimes that you've given statements on. And then in the next, you say, but if you can arrange it that I can get the death penalty quickly, I'll plead to it. If you didn't do them, why would you want to plead to it?

MR. DAVIS: To get out.

\* \* \*

MR. DAVIS: Yeah, [I was at one home invasion.] But there was nobody killed in the home I was at. See, like I said, like I said if things can be arranged like I said everything will be all right. But I don't want to be sitting, I don't want to be waiting. I just want to go ahead and get it over with.

MR. KUEHN: Let me tell you something, Mr. Davis. I'll do everything I can to arrange that for you. To see that you are executed promptly and efficiently, but I only want to do that if you're a murderer. Are you a murderer?

MR. DAVIS: Yeah, I'm a murderer.

MR. KUEHN: Is that the truth?

MR. DAVIS: Yeah, that's the truth.

MR. KUEHN: Well, now convince me that that's the truth. Tell me about each one of these like you told the police. I don't want to send an innocent man to his death. Do you understand?

MR. DAVIS: Yes, sir. If I can get some papers that I

can sign saying that I will be destroyed after I get through talking, I'll talk, I'll give you, I'll tell you everything. I mean everything. I mean everything."

Defendant subsequently indicated that he wanted the State to destroy him, and Mr. Kuehn responded that, as State's Attorney, it was his duty to prosecute cases. He then stated:

"MR. KUEHN: Probably from being in the jail, you realize I've convicted Mr. Jones, Mr. Tiller and Mr. Bush. They're all looking at the death penalty. Eugene Walker has already received that sentence out of this jurisdiction. I'm telling you, as the State's Attorney, that if you are a murderer, if you can convince me that you're telling the truth that you are involved in all of these crimes, I give you my personal guarantee, Mr. Davis, that I'll do everything I can to see you down at Menard and in the electric chair and destroyed as soon as possible, but I'm not going to give you any favors on that guarantee until I hear you explain to me why I should seek that death penalty. Why you are a murderer.

MR. DAVIS: Okay, like, okay, then. (Inaudible) After I give you all the information about how long would it take?

MR. KUEHN: A few months.

MR. DAVIS: That's like suffering. Knowing you're going to do it, knowing you'll get it, you know, waiting, cause, that's the hang of waiting. I don't want to wait for nothing. And I ain't waiting. I wasn't waiting when I was doing that stuff out there on the street. Why should I wait now?"

Defendant later stated that he had not told the truth up to this point. He asked if it would take a couple of months before he could be executed, to which Mr. Kuehn responded:

"MR. KUEHN: I can't make you any promises, you understand? I can't make you any promises. I don't want you to give me any statement as a result of some promise even if it's a unique promise that I'll try to see you receive the death penalty. That's an odd request of a man. But I can't give you any promises. Do you want to tell me or explain something to me? Do you want to explain

about these statements? Why would you tell the police that you were at all these places? Do you want to tell me that, or do you want to tell—go through the details and convince me of the fact that you were telling them the truth? Do you want to talk to me at all? I want to do whatever you want to do right now."

Defendant immediately indicated that he did not wish to talk anymore. Mr. Kuehn then asked why he would make the statements and defendant stated that he was "tired of living." Subsequently, however, he claimed that his statements accurately reflected what had happened.

It is certainly questionable whether the quoted exchange can be fairly characterized as a plea discussion. The prosecutor obviously lacks authority to guarantee defendant a prompt execution. However, even assuming the conversation was plea related, we do not believe that evidence of this discussion constituted error at this stage of the proceedings.

In *People v. Hill* (1980), 78 Ill. 2d 465, 472, this court determined that the purpose underlying Rule 402(f) is to insure "that plea discussions may be conducted in an atmosphere of candor, free of the risk that statements made during negotiations will be used *as evidence of guilt*." (Emphasis added.) Evidence of plea discussions could have a " 'devastating' effect" upon the jury (78 Ill. 2d 465, 474), because it may well infer defendant's guilt from the fact that he pleaded, or attempted to plead, guilty. However, in the instant case, the plea discussion was not used as evidence of guilt. Defendant's guilt had already been established, in the guilt phase of his trial, and therefore the purpose for the rule is no longer applicable. (See *People v. Greer* (1980), 79 Ill. 2d 103, 118-19 (evidence of plea discussion is proper where commission of alleged act is not disputed).) Further, the tape was not introduced in the first stage of the sentencing hearing, during which the State must prove an aggravating factor upon which the death penalty could be imposed. There, we would agree that

defendant's guilt of a necessary aggravating factor should not be determined by the fact that he admitted guilt thereto in the course of plea discussions. Here, however, the tape was introduced into evidence during the second phase of the sentencing hearing, when defendant's eligibility for the death penalty had already been determined.

Section 9—1(e) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)) allows for the introduction of evidence during the second phase of the sentencing hearing which would not be admissible during the guilt phase of trial. In ruling on the admissibility of evidence, the judge may conduct a broad inquiry " '*** largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496, quoting *Roberts v. United States* (1980), 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362; *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083.) The factors controlling admissibility are the relevance and reliability of the proffered evidence. This determination lies within the discretion of the trial judge. See *People v. Free* (1983), 94 Ill. 2d 378.

It is further contended that the videotape was inadmissible as evidence because it violated defendant's right to silence and to be free from self-incrimination. Specifically, defendant asserts that he was subjected to further questioning after invoking his right to remain silent. There is no question that if an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28; see, *e.g., Michigan v. Mosley* (1975),

423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.

At the beginning of the taped discussion, defendant was informed of his constitutional rights, including the right to have counsel present during the questioning and the right to remain silent. He stated that he did not mind talking without his lawyer present and indicated a willingness to discuss his prior statements. As noted previously, after the prosecutor informed defendant that he could not make any promises regarding the request for a prompt execution, defendant stated that he did not wish to talk anymore. The prosecutor then asked defendant if he realized that evidence was being developed based on the prior written statements and if he would like to explain his defense. Defendant indicated that he made the statements because he was "tired of living," and that he was not threatened or promised anything by anyone to make those statements. Subsequently, the following exchange took place:

> "MR. KUEHN: I'm at this point trying to understand, but you indicated that you don't really want to talk anymore. Is that your wish?
> MR. DAVIS: (Inaudible).
> MR. KUEHN: I'm not going to talk to you anymore.
> MR. DAVIS: Like I gave them statements? That's the way it happened. Just the way I gave my statements."

Sergeant Lay, who was present at the questioning, asked defendant to tell the truth, and Mr. Kuehn stated that he was willing to listen, "but everytime we get down to talking about it, I don't know whether you really want to talk about it." After further brief questioning, defendant again stated that he did not wish to talk anymore. Mr. Kuehn replied that he would have defendant returned to jail and would not continue the conversation. However, as defendant was preparing to leave, the prosecutor asked if defendant would mind being asked one more question. Defendant responded: "Go ahead." In reply to several

further inquiries, defendant stated that he knew Lawrence and Harris, that they were his cellmates, that he knew they were convicted for a crime in which defendant implicated himself, and that he was not threatened to confess to that crime. Mr. Kuehn then asked: "Well, then why did you confess to that? Did you do that one?" Defendant replied: "Like you say, I'll get back with you in the next day or two." The conversation was then terminated.

We agree with defendant that his right to remain silent was not scrupulously honored. He was subjected to questioning after he indicated a desire to cease the discussion. It has recently been held that, even in the sentencing hearing, a defendant's fundamental constitutional rights cannot be abrogated. (*People v. Szabo* (1983), 94 Ill. 2d 327.) Nevertheless, after a careful review of the conversation in question, we find that it was not reversible error. As noted previously, the jury, during the guilt phase of the trial, was already familiar with the statements defendant made regarding the murders, as they were read in full by the prosecutor. During the taped discussion, there were only vague references to additional crimes, except one offense for which Lawrence and Harris were convicted. The jury was previously aware, during the guilt phase of defendant's trial, of this incident because it was argued by defense counsel, in an effort to indicate that defendant confessed to crimes in which he was not involved. Although defendant did state that he took part in burglaries during which no one was killed, the jury heard testimony establishing that he was convicted for burglary. With respect to defendant's statement that he was "tired of living," we cannot assume, as defendant urges, that this would influence the jury's decision as to whether or not to impose the death penalty. In fact, defense counsel referred to defendant's desire to die as a mitigating circumstance, asserting that it indicated

he was emotionally disturbed. Finally, although defendant did admit during the discussion that the statements he gave the police were true, he did so immediately after the prosecutor agreed not to talk with him anymore.

While defendant does not cite *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, with reference to this contention, we feel that it should be distinguished from the circumstances in the instant case. In *Estelle,* the Supreme Court vacated a death sentence because defendant's fifth amendment rights were violated during the sentencing hearing. At that time, a doctor who had conducted a pretrial psychiatric examination of the defendant testified that, from his conversation with defendant, he concluded that defendant was a severe sociopath and would commit further criminal acts if given an opportunity to do so. Under the applicable Texas law, an issue for the jury to determine in deciding the propriety of the death sentence is the probability that defendant would commit future criminal acts of violence. The court held that defendant's fifth amendment rights were violated because, prior to the psychiatric examination, he was not informed of his right to remain silent and that the statements could be used against him. The evidence was apparently not presented to the jury during the guilt phase of defendant's trial. Thus, the possibility that this "new" evidence could prejudice the defendant is clear. It was directly relevant to an aggravating factor necessary for the imposition of the death penalty.

In contrast, the defendant here was fully apprised of his constitutional rights. That he was aware he could refuse to answer certain questions is clear because he did so twice during the conversation. Further, no new evidence was elicited which we believe was of a prejudicially incriminating nature for purposes of sentencing. See *People v. Black* (1972), 52 Ill. 2d 544, 556, *cert. denied* (1973), 441 U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155

(fourth amendment violation deemed harmless where tainted evidence could have no "impact of consequence upon the jury when viewed against the other evidence").

Defendant further asserts that the videotape was improperly admitted into evidence because it violated his right to confrontation. At one point during defendant's taped discussion with Mr. Kuehn, the prosecutor informed him that Holman stated that defendant "did the shooting." Because defendant could not confront Holman on this issue, he alleges that the rule established in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, was violated.

In *Bruton,* defendants Evans and Bruton were jointly tried on a Federal charge of armed postal robbery. A witness testified that Evans confessed that he and defendant committed the robbery. Because Evans did not testify, he was not subject to cross-examination by Bruton. In reversing Bruton's conviction, the court held that a codefendant's confession, implicating the defendant, is not admissible in evidence where the codefendant does not take the stand and is not subject to cross-examination.

This situation is not analogous to the instant case. Here, defendant and Holman were not codefendants in a joint trial, and the evidence was not used at trial to prove defendant's guilt. (See *People v. Wright* (1974), 56 Ill. 2d 523, 533 (*Bruton* is inapposite where the statement was not made by a codefendant in a joint trial).) Further, we are unaware of any reason why Holman would have been unavailable to testify. Defendant could have called him to the stand for purposes of cross-examination if he so desired.

It should again be noted that the videotape was introduced into evidence during the second phase of the sentencing hearing. At that time, the only issue to be determined was whether there were mitigating circumstances sufficient to preclude imposition of the death penalty. The

defense presented no testimony relevant to mitigating factors except that provided by defendant's wife. The only real point of her testimony was to indicate that, if defendant were sentenced to prison instead of death, she would visit him. Under these circumstances, we cannot say that the jury would have improperly considered the videotape so as to outweigh otherwise significant mitigating factors.

During the prosecutor's closing argument to the sentencing jury, he stated: "[W]hether or not this defendant actually receives the death penalty, won't be in your hands. This decision of whether you're going to recommend he receive it is." Defendant alleges that this remark is either an improper reference to appellate review or a misstatement of the law, either of which denied him a fair sentencing hearing.

Defendant did not object to this statement. Failure to object to the admission of evidence, even in the context of a death case, generally precludes review of the issue on appeal. (See *People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Carlson* (1980), 79 Ill. 2d 564, 575-78.) In addition, the jury was clearly instructed that its decision was binding upon the judge. Defense counsel, during closing argument, also emphasized the fact that any decision the jury made would be final.

Defendant further contends that he was denied due process at the sentencing hearing when the court refused to give an instruction listing nonstatutory mitigating factors for the jury to consider. Specifically, defendant requested that the jury be instructed as follows:

"Mitigating factors include, but are not limited to, the following circumstances:

1. The defendant was not personally present during the commission of the act or acts causing death;

2. The murdered individuals were not actually killed by the defendant;

3. The defendant's criminal conduct was induced or facilitated by someone other than the defendant.

> If, from your consideration of the evidence, you find that any of the above mitigating factors are present in this case, or that any other mitigating factors are present in this case, then you should consider such factors in determining whether to recommend the imposition of the death sentence."

The instruction was refused on the grounds that these factors were not specifically listed as mitigating circumstances in the statute. We believe the trial judge's reason for refusing the instruction was improper. As the Supreme Court stated in *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65:

> "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

Here, however, factor No. 1 of the instruction was actually given to the jury. With regard to factor No. 2, we find that this instruction was overly broad. The evidence indicated that defendant did actually kill one of the murder victims. With regard to factor No. 3, there is no evidence in the record to support it.

Further, the *Lockett* court held only that a defendant cannot be precluded from introducing into evidence any relevant mitigating factors. Because the Ohio statute in question only allowed consideration of specific mitigating circumstances, the court held that it was unconstitutional. In the case before us, the trial judge clearly indicated that the jury was not limited to a consideration of the statutory mitigating circumstances. He instructed the jury, in part, as follows:

> "In your deliberations in this stage of the hearing, you shall consider any aggravating and *any mitigating factors which are relevant to the imposition of the death penalty.*

Mitigating factors are those facts or circumstances which provide reasons for imposing a sentence less than the death penalty. Mitigating factors *may* include:

1. The defendant has no significant history of prior criminality;

2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;

3. The murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;

4. The defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;

5. The defendant was not personally present during commission of the act or acts causing death;

6. *Any other facts or circumstances that provide reasons for imposing less than the death penalty."* (Emphasis added.)

We have held that where the instruction requires the jury to consider all mitigating factors, the dictates of *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, are satisfied. *People v. Free* (1983), 94 Ill. 2d 378, 420.

Defendant's next allegation of error concerns a trial court ruling that allowed the State to present both closing and rebuttal arguments during the sentencing hearing. He urges that this was error since the prosecution, during the second stage of the sentencing hearing, no longer had any burden of proof. This issue was recently resolved adversely to the defendant in *People v. Kubat* (1983), 94 Ill. 2d 437, 488.

While this case has been under advisement, the United States Supreme Court filed an opinion in *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368. Defendant contends that the *Enmund* decision precludes imposition of the death penalty in the instant case. We disagree.

In *Enmund,* two people were shot to death by Enmund's codefendants during the course of a robbery. Enmund's participation in the offense was that he drove the getaway car. He was not present at the scene of the crime. On the basis of this limited involvement, he was convicted of first-degree murder and sentenced to death under the felony-murder portion of the Florida statute. In reversing the death penalty, a majority of the Supreme Court held:

> "[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not." (458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.)

The court went on to state that the sentence had to be reversed "[b]ecause the Florida Supreme Court affirmed the death penalty *** in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or *contemplated* that life would be taken ***." (Emphasis added.) 458 U.S. 782, 801, 73 L. Ed. 2d 1140, 1154, 102 S. Ct. 3368, 3379.

We find the circumstances in the instant case clearly distinguishable from those in *Enmund*. In this case, the defendant did not receive the death penalty for his participation in a felony, during the course of which a murder spontaneously occurred. The aggravating factor upon which the death penalty was sought was that defendant had been convicted of murdering two or more people. As previously noted, in the Cash case, defendant was clearly convicted on an intent-to-kill theory, as that was the only murder theory upon which the jury was instructed. A different jury found defendant guilty of the Oertel murder on the grounds that he (or a person for whom he was re-

sponsible) either intended to kill or do great bodily harm, or knew his act would cause death or great bodily harm. In the instant case, the jury was instructed as to all theories of murder. It is therefore unclear upon which theory they found defendant guilty.

However, even if the jury returned a guilty verdict based on felony murder, and although the evidence indicates that defendant was not the "triggerman," *Enmund* is inapplicable. In the instant case, by defendant's own admission, he was present during the course of the burglary. Indeed, defendant stated that while his codefendant shot the victim, he was carrying stolen items out to his car. Further, defendant certainly had reason to contemplate that a life would be taken, or that lethal force would be employed. As previously noted, defendant confessed to participating in the Mueller murder. This killing occurred before the murder which is the subject of the instant case. Defendant stated that the victim was shot by Holman while defendant was carrying stolen property to his car. In view of the similarity in circumstances, the conclusion is inescapable that defendant must have anticipated the killing of the victim in the instant case.

As the Supreme Court intimated in *Enmund,* the death penalty may be imposed on a defendant who does not himself kill "if the likelihood of a killing in the course of a [felony] were so substantial that one should share the blame for the killing if he somehow participated in the felony." (458 U.S. 782, 799, 73 L. Ed. 2d 1140, 1153, 102 S. Ct. 3368, 3378.) This is just such a case, and we hold that *Enmund* does not preclude imposition of the death penalty.

Also distinguishable from the instant case is this court's recent opinion in *People v. Tiller* (1982), 94 Ill. 2d 303. There defendant's death sentence was reversed in light of *Enmund.* However, in *Tiller,* the evidence indi-

cated that defendant was not present when his codefendant murdered one of the two victims. Here defendant was present and it is clear that he must have contemplated that lethal force would be employed by Richard Holman. Finally, the defendant in *Tiller* was convicted of two related murders. The deaths occurred at virtually the same time, in the same place, and arose out of the same incident. In our case, the defendant was convicted of three separate murders. The Cash conviction resulted from an intent to kill, and there the evidence indicated defendant was the "triggerman."

In defendant's *pro se* brief, he raises two additional contentions regarding the sentencing proceeding. He argues that his rights were "totally violated by the Court and State," and that the videotapes introduced during the sentencing hearing were altered by the State. We find no evidence in support of this allegation, and defendant points to none.

He also contends that his eighth amendment rights were violated because he received a death sentence instead of a prison term. He states that the prosecutor offered him a plea bargain in which he would receive 80 years' imprisonment "for all the [crimes] they had Defendant [charged] with." Again, the record discloses no evidence in support of this allegation.

For the reasons stated, the judgment of the circuit court of St. Clair County is affirmed. The clerk of this court is directed to enter an order fixing Tuesday, May 24, 1983, as the date on which the sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

JUSTICE GOLDENHERSH, concurring in part and dissenting in part:

I would affirm the conviction for murder, vacate the death penalty, and remand to the circuit court for the imposition of a sentence other than death. Clearly, under *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, the death penalty cannot be imposed in this case.

In his statement, after relating the manner in which he and Holman entered the victim's mobile home, defendant stated, "I carried the T.V. and gun out to the car. Then I heard a shot and Ricky came out and said he shot the old man." There is no evidence that shows that defendant was present when the murder was committed or that he contemplated it. The majority opinion states, "[D]efendant certainly had reason to contemplate that a life would be taken, or that lethal force would be employed" (95 Ill. 2d at 51) but cites nothing in the record which supports this conjecture.

The majority makes reference to the fact that in the Cash murder defendant was the "triggerman." (95 Ill. 2d at 50-51.) We are not here concerned with the question whether the death penalty may be imposed for the Cash murder. The question here is whether defendant may be sentenced to death on an accountability theory for the death of Mr. Biebel. Obviously, under *Enmund*, the answer is "No."

JUSTICE SIMON, dissenting:

Although I have no intention of disputing the prosecutor's observation that the defendant, Girvies L. Davis, is no altar boy, he was still entitled to a fair trial and to the protections the law gives to every person charged with crime. Both the guilt and the sentencing hearings were deficient in these respects. Because of the series of errors

outlined below I believe the defendant's conviction should be reversed and this cause remanded for a new trial.

## THE VERDICT OF GUILT

### I

I find no justification for the court's refusal to dismiss juror Lewis after he informed the trial judge of his close friendship with a relative of a person murdered in a robbery in which the defendant might have been involved. As the majority opinion points out, the juror knew that his close friend was bitter about the incident and because of his friendship with the victim's relative, juror Lewis stated he did not know whether he could keep an open mind. He recognized that he had a conflict of interest and that it was his duty to make the court aware of it. The only thing Mr. Lewis said which could possibly support the majority's conclusion that leaving him on the jury was not improper was his statement, "I think for this case, since it is a separate case, I think I could look at this case ***." This was at best an ambiguous response to the problem which confronted Mr. Lewis. It did not justify the conclusion that he could be impartial, especially because the statement quoted above was preceded by his remark, "I don't think I could ever put it totally out of my mind because it was someone near to me ***." I am disturbed, as juror Lewis himself apparently was, over whether he could be objective, knowing that if he voted for acquittal his close friend might be displeased. In my judgment, the trial judge did not properly take into account the concern that juror Lewis might have about facing his close friend if he found it necessary to vote to acquit the defendant, a prospect which might have prevented Mr. Lewis from viewing the evidence impartially.

The majority relies on the trial judge being in a superior position to observe the juror's demeanor and decide

what his attitude really was. But I cannot understand how observing the juror's demeanor would assist the trial judge in knowing how Mr. Lewis would resolve the conflict of interest arising from his friendship with the victim's relative. The fact that a conflict of interest existed should have been sufficient to disqualify Mr. Lewis. *People v. Stoval* (1968), 40 Ill. 2d 109.

A remark made by the trial judge, who had previously presided over an unrelated murder trial of the defendant's accomplice, is relevant to this issue. After the jury in this case had returned the verdict imposing the death penalty, the trial judge stated, "*** Mr. Davis [the defendant] is a no-good, cold-blooded killer that doesn't deserve to live." It is not clear from the record at what point the trial judge formed this impression of the defendant; it is entirely possible that he might have formed that opinion, at least in part, early in the trial before juror Lewis mentioned his concern about continuing to sit in the case. If that is so, the trial judge's own observation of juror Lewis' demeanor in deciding whether to retain him on the jury is suspect.

With two alternate jurors having been selected, I see no reason why in the interest of fairness and having a jury which was not only impartial but also had the appearance of impartiality, the trial judge should not have acquiesced in the replacement of Mr. Lewis by one of the alternates. It appears to me that juror Lewis was more sensitive to the conflict of interest that his friendship with the victim's relative created for him than was either the circuit judge or this court, and that permitting Mr. Lewis to remain on the jury was an abuse of discretion.

II

A second reason for granting a new trial is the prosecutor's highly improper reference to the other murders in which the State claimed the defendant was involved. Evi-

dence of the Mueller and Sepmeyer murders was admitted for the purpose of showing knowledge and *modus operandi*—preying upon elderly persons by invading their homes when they were alone, stealing their property and shooting them. I find no fault with admitting this evidence for this limited purpose. But that is not the way the prosecutor used the other two murders in his final argument. He told the jury that the State and police officers wanted the defendant convicted because he and his accomplice were out killing and they killed three "defenseless old, decrepit, aged people." The defendant was charged in this case with only one murder, that of 89-year-old Charles Biebel. He was not on trial for the Mueller and Sepmeyer murders. It was improper to urge the jury to convict the defendant because he also murdered Mueller and Sepmeyer, and the defendant's objection to the final argument should have been upheld.

Unlike the majority, I am not comforted by the trial judge's instruction to the jury that the Mueller and Sepmeyer murders were to be considered only for the limited purpose of showing defendant's design and knowledge. This advice was not given in a single, direct instruction but rather in two separate instructions, one of which simply stated the general rule that any argument made by the attorneys not based on the evidence should be disregarded. There is no realistic way of knowing whether the instruction it received impressed the jury as much as the prosecutor's colorful and highly prejudicial argument, designed to remind the jury that the defendant was involved in three killings in addition to the two for which he already stood convicted.

## III

I also disagree with the way the majority disposes of the defendant's objection that the prosecutor used pe-

remptory challenges to obtain an all-white jury. After concluding, as the majority did, that the record fails to show any pattern of exclusion of prospective jurors on the basis of race, I fail to understand the need for the majority to refer to *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, for the proposition that the prosecutor has a right to exclude prospective jurors in exercising peremptory challenges for any reason, including their race.

In the first place, I am not certain that *Swain* so holds, even as a matter of due process. Although, as pointed out by the appellate court in *People v. Payne* (1982), 106 Ill. App. 3d 1034, 1041, the Supreme Court in *Swain* stated that "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control" (380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 836), the court observed later in the opinion that the peremptory challenge is not designed to facilitate or justify a system which results in denying black persons "the same right and opportunity to participate in the administration of justice enjoyed by the white population." (380 U.S. 202, 224, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 838.) Thus, I construe *Swain* as recognizing that peremptory challenges are not totally outside the control of the trial court.

Second, I believe that the strength of the *Swain* holding has been diminished by later decisions under the sixth amendment in *Duncan v. Louisiana* (1968), 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444, and *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692. These decisions recognized "the fair-cross-section requirement as fundamental" to the sixth amendment right of a defendant to a jury trial in a State criminal prosecution. The rights of an accused in a State trial to the stric-

tures of the sixth amendment in the selection of a jury and their impact on exclusion of persons from a jury by peremptory challenge only on the basis of race, sex or religion were not decided in *Swain.* In fact they were not even raised, because *Swain* was decided before the sixth amendment was held to be applicable to State criminal trials. (*People v. Payne* (1982), 106 Ill. App. 3d 1034, 1042.) The *Swain* holding dealt only with whether peremptory challenges aimed at producing an all-white jury comported with due process of law under the fifth and fourteenth amendments, and is not authority for a holding that such challenges do not violate the sixth amendment, particularly in light of *Taylor* and *Duncan.*

For these reasons I believe that deciding to what extent the trial court is responsible for controlling the use of peremptory challenges by a prosecutor to exclude persons from a jury on the basis of their race, sex or religion is a mistake in this case, and should be deferred until a case reaches this court with a record which shows more clearly than the one now before us that a number of prospective jurors were excluded on the basis of race with the purpose of obtaining an all-white jury. Until such a factual situation is presented to this court, I believe that resolution of the issue merely in reliance on *Swain v. Alabama* is obsolete and too simplistic to provide helpful guidance for trial courts. The issue has come to the attention of our appellate court on numerous occasions in the past three years and also during the 1970 to 1980 decade, although on less frequent occasions. I believe that to give proper guidance to our trial courts we should deal with the constitutional issue more fully than the court has been able to on the basis of the facts presented, briefs filed and arguments advanced in this case.

### THE DEATH SENTENCE

In my judgment, the defendant is also entitled to a

new sentencing hearing.

I

I believe that it was error to allow evidence that the wife of Frank Cash, one of defendant's victims, gave birth to a baby the day after he was murdered. My reasons for arriving at this conclusion are fully stated in my dissent in *People v. Free* (1983), 94 Ill. 2d 378 (Simon, J., dissenting). The only purpose this evidence could serve was as an emotional appeal to the jury. The majority relies on *Free,* where the admission of similar testimony was not held to be a ground for reversal. However, in that case, as the majority acknowledges, the defendant failed to object to the improper testimony and the court emphasized in *Free* that the defendant had waived the right to have the propriety of the evidence considered on appeal. In this case the majority concedes that the record implies that a timely objection was presented.

While it is true, as the majority points out, that this evidence came in during the second phase of the sentencing procedure, I am not aware that the law is that anything goes at this stage of the trial and that the doors are thrown open to any type of evidence the State desires to put in. The majority agrees "that comments and testimony regarding a deceased's family are generally improper." (95 Ill. 2d at 36.) I do not understand how they can be regarded as relevant or as serving any purpose other than to arouse the passions of the jury even when offered during the phase of the sentencing proceeding in which the court is receiving evidence in mitigation.

The majority's willingness on the basis of *Free* to accept irrelevant and improper evidence is inconsistent with this court's reasoning and decision in *People v. Szabo* (1983), 94 Ill. 2d 327. In the latter case we held that there were limits on the types of evidence that were ac-

ceptable in the second phase of the sentencing. Thus, for example, a prosecutor's closing remarks "calculated to play upon the jurors' emotions" and which we characterized as "clearly improper," "inflammatory and prejudicial" were held to be grounds for vacating the sentence of death in *Szabo*. (94 Ill. 2d 327, 363-64.) The limitations placed by *Szabo* upon the type of evidence which may be offered at the sentencing hearing do not correspond with what the majority of this court had to say on the same subject in *Free* and is saying in this case; it is my respectful suggestion that there exists a dichotomy between these opinions calling for reconciliation by this court.

The majority appears to be saying that reference to the birth of a child the day following the murder of its father was harmless in view of the three murder convictions, an attempted-murder conviction and convictions of burglary and battery which the jury was aware comprised the defendant's "significant criminal history." This is a bootstrap argument. If in view of the defendant's criminal history it is not reasonable to believe that the jury could have been influenced by hearing about the birth of the Cash baby, why bother to hold any hearing in mitigation? Perhaps the logical procedure would be merely to label the defendant a no-good, cold-blooded killer who doesn't deserve to live, as the trial judge ultimately did, and dispense entirely with the hearing in mitigation. Yet the mitigation hearing is required by the Constitution (see *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965) and the death penalty statute itself (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)). I fail to see why a hearing which is provided as an opportunity for the defendant to escape execution should be turned into a forum for the introduction of evidence by the State that is prejudicial to the defendant and is interdicted at other stages of the trial because it is irrelevant to any is-

sue in the case.

## II

Next, the prosecutor's suggestion to the jury in closing argument at the sentencing hearing that its decision would be a recommendation that the defendant receive the death sentence, but that whether he would actually be put to death would not be in their hands, denied the defendant a fair hearing. The majority disposes of this impropriety by first arguing that because no objection was raised by the defendant, the error was waived. But, as I pointed out in dissenting in *Free*, "few propositions have a longer pedigree in the common law of this State than that any irregularity not *expressly* waived in the trial of a capital case" must be examined if raised on review. (*People v. Free* (1983), 94 Ill. 2d 378, 435 (Simon, J., dissenting).) This old rule has recently been buttressed by this court's decision in *People v. Brownell* (1980), 79 Ill. 2d 508, where the defendant received a new sentencing hearing on an issue which was neither raised in the trial court nor on appeal, and by *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, where the Supreme Court granted a new sentencing hearing on a ground that was not expressly presented in the defendant's petition for *certiorari*. Whether the instruction the jury was given that a verdict by the jury that the defendant receive the death sentence would require the court to impose that sentence was given more attention by the jury than the prosecutor's misleading remarks is impossible to determine. It is significant, however, that in spite of defendant's long criminal history, which the State has emphasized before this court, which disclosed the defendant might have been involved in the murder of five persons, and of which the jury was aware, the sentencing jury deliberated for more than eight hours before deciding the defendant should receive the death penalty. In *Szabo*

we held that it was improper for a prosecutor, in arguing for a death sentence, to suggest to a jury that if the death sentence were not imposed the defendant might be released on parole. (See also *People v. Walker* (1982), 91 Ill. 2d 502, 515-17.) I believe it is an error of at least equal magnitude to mislead a jury by suggesting to it that its decision would be only advisory, and whether the defendant would actually be put to death was a matter someone else would ultimately decide. This error alone warrants a new sentencing hearing.

### III

I believe the introduction of the videotape recordings in which the defendant expressed the desire to be put to death quickly was another error. The sentencing jury witnessed and heard out of the defendant's own mouth that he desired to be executed promptly. This was after the jury had already found the defendant guilty, so one can only wonder what purpose introduction of the video-tapes served other than to let the jury know that at one time the defendant said he wanted to die and get it over with.

The defendant argues that his dialogue with the State's Attorney of St. Clair County actually constituted a plea bargain, a request by the defendant that he be guaranteed quick execution. As I read the transcript of the tapes I would characterize the conversation as a plea bargain, although I concede it was a strange and unusual one. Contrary to the majority, I see no reason why a plea bargain would be less harmful if admitted during the second phase of the sentencing hearing than earlier in the case. Our rules (87 Ill. 2d R. 402(f)) make no such distinction; they prohibit the use of a plea discussion "in any criminal proceeding," and the second phase of the sentencing hearing is clearly a part of a criminal proceeding.

Another reason the videotapes should not have been

admitted even at this stage of the proceedings is that they included the statement by the prosecutor that the defendant's accomplice, Ricky Holman, had implicated the defendant in several incidents in which Holman claimed the defendant did the shooting. This was the first time that the jury heard that the defendant had himself shot any of the victims. This hearsay evidence of Holman's charges was obviously prejudicial to the defendant before a jury determining whether he should live or die. The tapes were relevant only to the issue of whether the defendant was the triggerman. The evidence should have been introduced, if at all, at the first, or aggravating, stage of the sentencing hearing. The State's failure to introduce it then does not entitle it to do so in the mitigation phase of the hearing, by which time all of the State's evidence in aggravation should be known to the defendant and the jury.

The videotapes were irrelevant to the gravity of the defendant's conduct and shed no light on his rehabilitative potential, and under the standards set forth in *People v. Szabo* (1983), 94 Ill. 2d 327, they should not have been admitted into evidence. The fact that at one time the defendant told the State's Attorney he wanted to die did not make him more deserving of the death penalty, and even if it did, the videotapes may have been confusing to the jury because at the time of his sentencing the defendant wanted to continue to live.

IV

Two additional reasons, even more fundamental, require the conclusion that the death sentence is impermissible in this case. First, the majority's decision that the State has carried its burden of proving that defendant's multiple convictions for murdering Charles Biebel, John Oertel and Frank Cash constitute an aggravating factor

under the death penalty statute is not supported by the record. The statute reads in relevant part:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense *** who has been found guilty of murder may be sentenced to death if:

\* \* \*

3. the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts *so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts ***."* (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).

Clearly the legislature did not intend for capital punishment to be imposed upon any defendant convicted of two or more murders, even when those convictions were based on subsection (a)(1) of the murder statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)). The italicized phrase requires the State to prove at a minimum that the defendant either *intended to kill* at least two people or engaged in two distinct, *premeditated* murderous acts. The record shows only that the Cash murder was intentional. In the case of the Oertel conviction, the jury was instructed that it could convict the defendant of murder if it found that defendant acted with intent to kill, with intent to do great bodily harm, or with knowledge that death or great bodily harm would result. He was convicted of the Biebel murder after the jury was instructed on felony murder and knowledge that death or bodily harm would result, and after a statement was made by the prosecutor in closing argument that intent to kill is irrelevant in cases of felony murder. Nothing in the jury's verdict in either the Oertel or Biebel cases or in the re-

cord indicates which theory of murder it adopted. See *People v. Harris* (1978), 72 Ill. 2d 16.

Defendant's convictions of the Cash, Oertel and Biebel murders could serve as the basis for imposing the death penalty only if the State had been able to demonstrate unambiguously that at least two of them resulted from an actual intent to kill or from distinct premeditated acts. Aggravating factors relied on to support a death sentence must be proved beyond a reasonable doubt. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(f); see *People v. Brownell* (1980), 79 Ill. 2d 508, 534.) The evidence in this case shows at most that the defendant might have intended to kill John Oertel and Charles Biebel; the record falls short of showing that the jury actually found that such an intent existed.

Finally, because of *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, the defendant would not be eligible for the death penalty for the murder of Charles Biebel if the verdict in this case were based on felony murder, a possibility which the evidence and the jury verdict clearly leave open. The majority opinion acknowledges that the evidence indicates that the defendant was not the triggerman in the Biebel murder and that he was engaged in taking stolen items out of the Biebel house to his car when the murder was actually committed. It observes, however, that the *Enmund* decision permits capital punishment where a defendant convicted of felony murder "contemplated" that life would be taken (458 U.S. 782, 801, 73 L. Ed. 2d 1140, 1154, 102 S. Ct. 3368, 3379), and proceeds on the theory that the defendant must have so contemplated in this case because the Mueller murder had occurred earlier under similar circumstances. That is too artful a use of the word "contemplate" in deciding whether a defendant is excluded from the protection of *Enmund,* and is a depar-

ture from the *Enmund* holding that the eighth amendment forbids imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.

Neither a burglary nor the act of carrying stolen items out of a house that is being burglarized is in itself a murderous act. Such conduct by itself does not intimate an intent to kill. That a murder occurred while defendant was carrying items out of a house on a previous occasion may be enough to convey notice to defendant that his accomplice has murderous tendencies, so that a second murder might be said to be *foreseeable* should defendant engage in similar conduct in a subsequent burglary. He would then be liable for the tort of wrongful death as well as for the crime of felony murder. But foreseeability is not the same as intent, active contemplation, or actual anticipation. To equate the concepts, as the majority does, is to read into negligent or reckless conduct a volitional element that does not exist. Basing an execution on so expansive a definition of the word "contemplate" not only does violence to the clear holding of *Enmund* that a person convicted of felony murder cannot constitutionally be put to death absent a showing that he intended that life be taken, but ignores the fact that our criminal code specifically distinguishes "intent" (Ill. Rev. Stat. 1979, ch. 38, par. 4—4) from "knowledge" (Ill. Rev. Stat. 1979, ch. 38, par. 4—5), "recklessness" (Ill. Rev. Stat. 1979, ch. 38, par. 4—6), "negligence" (Ill. Rev. Stat. 1979, ch. 38, par. 4—7), and other states of mind and requires, in order to impose a death sentence, that a defendant convicted of felony murder intend to kill or at least know that as a consequence of his actions a death is likely to occur (Ill.

Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(b)). I conclude that it is error for the trial court or this court to treat bare foreseeability of the possibility of a death as satisfying the requirements of both *Enmund* and our capital punishment statute that a defendant actually intend a killing or knowingly acquiesce in one.